# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| HEATHER M. STEPHENS, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>URANIUM ENERGY CORP, INC., AMIR ADNANI, and MARK A. KATSUMATA,<br><br>    Defendants. | Civ. Action No. : H-15-1862<br><br>JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs, Mark Besendorfer and Robert Cramer, by and through their counsel, individually and on behalf of all others similarly situated, for their Amended Class Action Complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, conversations with witnesses, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Uranium Energy Corp., ("Uranium Energy" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Uranium Energy securities between June 7, 2013 and June 17, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials, as well as the "Promoter Defendants," as defined below.

2.      Uranium Energy is a "junior" uranium exploration and production company.  While no longer a "development stage entity," the Company has "yet to achieve profitability or develop positive cash flow from operations, and[, as of July 31, 2014, did] not expect to achieve profitability or develop positive cash flow from operations in the near term."  Rather, the Company has "focused primarily on expanding [its] South Texas uranium extraction and establishing additional uranium mines through exploration and pre-extraction activities and direct acquisitions. . . ."  As such, the Company admitted to facing and needing "to manage numerous challenges, risks and uncertainties inherent in our business and operations."

3.      According to the Company, acquiring uranium projects, exploring them and engaging in pre-extraction activities are capital intensive, requiring it to obtain "significant additional financing."  Because the Company had yet "to achieve profitability or develop positive cash flow from operations" to obtain that financing, it has relied "primarily on equity financings from the sale of [its] common stock."  During the Class Period, the Company also engaged in debt financing to fund its operations.  As such, the higher the stock price, the fewer shares the Company could issue to finance its operations.

2

4.     During the Class Period, therefore, the Company engaged in a scheme to defraud unsuspecting shareholders, paying promoters, directly and indirectly, to publish overwhelmingly positive reports about the Company, its prospects and its management.  In the absence of any material, positive information about the Company during the Class Period, Defendants' promotional campaign directly caused the price of Uranium Energy common stock to be artificially and substantially inflated.  Indeed, when the Company was paying for positive promotions, in the absence of any material, positive information specific to it or the broader markets, in general, the Company's common stock far outpaced the per-share price of other junior uranium producers and of the broader markets.

5.     In the absence of paid promotional activities, Uranium Energy's stock plummeted, resetting itself to track more closely the fortunes of its industry and broader markets.  In public filings throughout the Class Period, however, discussing risks related to the Company's common stock, including with respect to its volatility, Defendants failed to disclose the pervasive nature and effect of their paid promotional scheme.

6.     In addition, throughout the Class Period, in breach of its duty under Securities and Exchange Commission ("SEC") Rule S-K, Item 404, the Company failed adequately to disclose certain related party transactions in a way that enabled investors to observe that certain relatives of senior officers and directors of the Company were directly involved in scheme to promote the Company without disclosing payments therefore.

7.     On June 18, 2015, *TheStreetSweeper.org* published an article online, claiming that Uranium Energy was using undisclosed, paid stock promotions to increase the value of Uranium Energy shares.  That article stated in part that "UEC has been running up on promotions coming from Twitter, Seeking Alfa authors and reportedly hype paid by the company itself."

8.     As a result of this news, shares of Uranium Energy fell $0.18 or over 6.9% on unusually heavy volume, to as close at $2.42 on June 18, 2015.

9.     On June 19, 2015, the Company issued a press release, denying the allegations in the *TheStreetSweeper.org* article and threatening litigation action to uncover certain "motivations" of those who uncovered the scheme.  As a result of the Company's own release, consisting of a broad denial that did not meet the allegations head on, Uranium Energy's share price plummeted even further, dropping $0.62 or over 25.6% on unusually heavy volume, to as close at $1.80 on June 19, 2015.  Over two trading days, shares fell $0.80 or over 30.7%.

10.     As a direct and proximate result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiffs and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Uranium Energy is headquartered in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Lead Plaintiff Mark Besendorfer purchased the common stock of Uranium Energy during the Class Period as set forth in the certification he presented to the Court in support of his motion for appointment as lead plaintiff, incorporated by reference herein, and has been damaged thereby

16.     Lead Plaintiff Robert Cramer purchased the common stock of Uranium Energy during the Class Period as set forth in the certification he presented to the Court in support of his motion for appointment as lead plaintiff, incorporated by reference herein, and has been damaged thereby.

17.     Defendant Uranium Energy, Inc. ("UEI" or "Company") is a Nevada corporation with its principal executive offices located at 500 North Shoreline Ste. 800N, Corpus Christi, TX 78401. Uranium Energy's common stock trades on the NYSE under the ticker symbol "UEC."

18.     Defendant Amir Adnani ("Adnani") is a co-founder, and, at all times relevant hereto, the President and Chief Executive Officer of the Company.  According to the Company's Proxy Statement, on Form 14A, filed with the SEC, on June 19, 2015 ("2015 Proxy"), Adnani "is the founder and Chairman of Brazil Resources Inc., a publicly-listed gold development and acquisition company" and serves as a director of Garnero Group Acquisition Company, "a NASDAQ listed special purpose acquisition company (SPAC) which completed a $144 million IPO in 2014."

19.     Defendant Mark A. Katsumata ("Katsumata" and, with Adnani, "Individual Defendants") has served at all relevant times as the Company's Chief Financial Officer ("CFO"),

Principal Accounting Officer, Secretary, and Treasurer.  Katsumata purports to have more than 20

years' experience in financial positions in publicly listed companies, including serving as "Chief

Financial Officer/Vice President, Finance of Denison Mines Corp., an NYSE MKT and Toronto

Stock Exchange-listed uranium developer and explorer."  Katsumata also purports to be a certified

public accountant in Canada.

20.    The following defendants are referred to collectively herein as the "Promoter

Defendants":

a.  Defendant Raven Consulting Corp. ("Raven Consulting") is a Florida corporation

which, upon information and belief, maintains its principal executive offices at

6711 Frontier Lane, Tampa, FL 33625;

b.  Defendant *LuckyStockPicks.com* is a wholly-owned subsidiary of Raven

Consulting Corp. and, upon information and belief, maintains its principal

executive offices at 6711 Frontier Lane, Tampa, FL 33625;

c.  Defendant Brazil Resources Inc. ("Brazil Resources") is a Canadian corporation

which maintains its principal executive offices located at Suite 320 – 1111 West

Hastings Street, Vancouver, British Columbia, Canada, the same address as

Defendant Uranium Energy;

d.  Defendant Red Rock Media Group Inc. ("Red Rock") is a Nevada corporation

which maintains its principal executive offices located at 101 West Flamino Road,

#4-111, Las Vegas, NV 89147;

e.  Defendant Action Holdings, Inc. (a/k/a Action Media Holdings Corporation, d/b/a

JWT Action) ("Action Media") is an Ohio corporation which maintains its principal

executive offices located at 100 Park Avenue, 4th floor, New York, NY 10011; and

f.   Defendant Stock Gumshoe, Inc. ("Stock Gumshoe") is a Massachusetts corporation which maintains its principal executive offices located at 64 Reservoir Road, Leeds, MA 01053.

## SUBSTANTIVE ALLEGATIONS

### The Federal Securities Laws on Stock Promotion

21.   Section 17(b) of the Securities Act of 1933, 15 U.S.C. 77q(b), is commonly known as the "anti-touting" provision. It prohibits publicizing information about a security without "fully disclosing" any consideration received or to be received, directly or indirectly, from the issuer. *Id.*

22.   Congress enacted the anti-touting provision in part to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for."[1]

23.   In an "investor bulletin," the SEC has stated that "[s]ome microcap companies pay stock promoters to recommend or 'tout' the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows."  The SEC continued that any such publication must "disclose who paid them for the promotion, the amount, and the type of payment. ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice***."  (Emphasis added).[2]

24.   According to its Annual Report on Form 10-K for the year ended July 31, 2014, filed with the SEC on October 14, 2014 ("2014 10-K"), as of July 31, 2014, Uranium Energy had 89,136,505 weighted average number of shares outstanding, basic and diluted.  As of that same date, the closing price was $1.77 per share, giving Uranium Energy a market capitalization of just

---

[1] *S.E.C. v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (*quoting* House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).
[2] *http://www.sec.gov/investor/pubs/microcapstock.htm*.

over $157.8 million.  The SEC defines "microcap companies" as those with market capitalizations of less than $250 million and more than $50 million. As the class period began, Uranium Energy was a microcap company.

25.     On June 2, 2014, the SEC issued an "Investor Alert," titled "Investment Newsletters Used as Tools for Fraud."[3]  In that Alert, the SEC urged investors to "read carefully" newsletters and other promotional materials for information about whether the issuer compensated the promoter for a favorable article.  In particular, the SEC warned about promoters who disclosed not having received compensation or those that offer only vague disclosures – who fail specifically to disclose who paid them, the amount, and the type of payment.  The SEC further warned of promoters' "disclosures [that] are difficult to find or appear in tiny, hard-to-read print.  "Even if a newsletter makes specific disclosures about being compensated for promoting a stock," the SEC continued, "be aware that fraudsters may include such disclosures to create the false appearance that the newsletter is legitimate."  Uranium Energy and the Promoter Defendants engaged in just such a scheme.

26.     As detailed below, before and during the Class Period, Defendants engaged in a sustained, paid-promotional bombardment of the market that directly, materially and artificially affected the market price of its common stock.  While some of the promoters adequately disclosed payments they received, many did not.  In addition, by referring to one another's paid promotions and posts, the promoters created layers of promotion that effectively removed the taint of Uranium Energy's payments.  In addition, to confuse investors, in certain publications, while promoters disclosed that they received compensation, they did not receive it from Uranium Energy.  Rather,

---

[3] _http://investor.gov/news-alerts/investor-alerts/investor-alert-investment-newsletters-used-tools-fraud_.

Defendants paid for promotions through third parties, precluding even those investors who actually read the lengthy, fine-print disclosures the promotions may include from understanding the source of the payment the promoter received.  Defendants' scheme to use these shills succeeded in inflating the price of Uranium Energy's common stock artificially.

27.     As detailed below, in violation of the anti-fraud provisions of the federal securities laws, Defendants failed to disclose the existence of this promotional scheme and the effect it had on its common stock.

***SEC Regulations on Related Party Transactions***

28.     SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, requires issuers to disclose the following information relating to a transaction in which it "was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest:"

> (1) the name of the related person and the basis on which the person is a related person; (2) the related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction; (3) the approximate dollar value of the amount involved in the transaction; (4) the approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss; (5) in the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness; and (6) any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

29.     As detailed below, the paid promotional campaign in which Defendants engaged

involved Blender Media and/or Lindsay Capital Corporation, both of which have close familial ties to Defendant Adnani.  Yet Defendants omitted critical, and required details about these related party transactions, again shielding from investors the depth of the paid-promotions scheme, its relation to family members of the Defendants and its effect on the price of Uranium Energy's commons stock.

**Background**

30.     Uranium Energy is a Nevada corporation engaged in the production, development, and exploration of uranium.  It maintains its principal executive offices in Vancouver, British Columbia, Canada.  The Company owns mineral rights in uranium projects located in the states of Arizona, Colorado, New Mexico, Texas, and Wyoming, as well as in the Republic of Paraguay. Uranium Energy was formerly known as Carlin Gold, Inc. and changed its name to Uranium Energy Corporation in January 2005.

31.     Uranium Energy owns and operates one uranium mine in Texas, which is located in South Texas and is known as the Palangana Mine.  At Palangana, the Company employs in-situ recovery mining, which, when compared to more conventional forms of mining, entails lower capital and operating expenditures, shorter time to extraction, and reduced environmental impact. In November 2010, the Company commenced extraction of uranium oxide ("U3O8"), or yellowcake.

32.     Uranium Energy processes material from the Palangana Mine into drums of U3O8 at its fully-licensed and permitted Hobson processing facility, which is located just outside the South Texas city of Nichols.  The Company acquired the facility in December 2009 and, according to its most recent 10-K filing, Hobson "forms the basis for our 'hub-and-spoke' strategy in the State of Texas, specifically the South Texas Uranium Belt."

33.     Uranium Energy entered into a contract to deliver a certain minimum quantity of a uranium compound, triuranium octoxide, over a three-year period beginning in August 2011. During the 2012 and 2013 fiscal years, the Company made deliveries pursuant to the contract. Sometime during the 2014 fiscal year, however, the Company's remaining delivery commitment was canceled.

34.     As of July 31, 2015, Uranium Energy had no other supply agreements in place.  The Company has "proactively reduced production at their Palangana mine due to low uranium prices," with the stated intention that it would increase production and maximize profits by selling when market conditions improve.

### Blender Media

35.     Uranium Energy's CEO, Defendant Adnani, founded an investor relations firm known as Blender Media.  Defendant Adnani founded Blender Media in September 2004 and served as its President, Chief Executive Officer, and as a director until October 2006.  Until recently, Blender Media had maintained its corporate offices at 1111 West Hastings Street, Suite 320, Vancouver, British Columbia, Canada, the same address at which Uranium Energy maintains its principal executive offices.

36.     According to its website, Blender Media is a "digital agency specializing in website design and investor marketing solutions" (*blendermedia.com*), with a focus on providing "strategic marketing and financial communications services to public companies and investors in mineral exploration, mining, and energy sectors."  *See* SEC Form 10-K, filed 11/4/13.  Uranium Energy previously has disclosed that, "[d]uring fiscal year ended December 31, 2006, we paid $10,224 for marketing and media services to Blender Media."  *See* SEC Form 424B3, filed 6/30/08.  The current Uranium Energy website discloses that it is "designed and powered by Blender Media"

(*blendermedia.com*).  Among other things, Blender Media "produced a short animated video under [Uranium Energy's] website section 'Uranium 101'" (*blendermedia.com*).

37.     The ties between Uranium Energy and Blender Media go beyond their shared business address, Defendant Adnani, and their ongoing business relationship.  Defendant Adnani's brother, Arash Adnani, currently serves as President of Blender Media.  According to *Forbes.com*, Defendant Adnani's cofounder at Uranium Energy "was his father-in-law, Alan Lindsay, 61, who, in the words of Citron Research analyst Andrew Left, 'has left behind nothing but companies that have promised high hopes and left investors with empty pockets.'"[4]  Lindsay has served as Chairman and as a director of Uranium Energy since May 2003.  Upon information and belief, Blender Media is owned by Oliver-Barret Lindsay and/or John Lindsay, who are Lindsay's sons and Defendant Adnani's brothers-in-law.

***Brazil Resources***

38.     Defendant Adnani also founded and continues to serve as Chairman of a company known as Brazil Resources Inc., which, according to its website, is "a public mineral exploration company with a focus on the acquisition and development of projects in emerging producing gold districts throughout the Americas" (*brazilresources.com*).  Like Uranium Energy and Blender Media, Brazil Resources maintains its corporate offices at 1111 West Hastings Street, Suite 320, Vancouver, British Columbia, Canada.  Pat Obara, who serves as Uranium Energy's Vice President of Administration, and David Kong, who currently serves as a director at Uranium

---

[4] Christopher Helman, "Energy's Latest Battleground: Fracking For Uranium" (published on Jan. 23, 2013 by *Forbes.com*) (available at *http://www.forbes.com/sites/christopherhelman/2013/01/23/fracking-for-uranium/*) (attached hereto as Exhibit 1).

Energy, both serve in corporate leadership positions at Brazil Resources—Obara as Chief Financial and Director, and Kong as Director.

39.     As detailed below, Brazil Resources retained an entity known as Red Rock Media to provide advertising and promotional services for the benefit of Uranium Energy.

***The Curious Rise in the Price of Uranium Energy Shares***

40.     In the aftermath of the Fukushima nuclear disaster in March 2011, prices for shares of uranium companies bottomed out.  Public opinion of nuclear energy declined precipitously, and the uranium production industry did not witness much growth in the ensuing three years.  At a time when "[p]rices for three of the largest uranium producing companies [we]re nearing all-time lows in share price,"[5] it was surprising to many observers when the price for Uranium Energy shares suddenly rocketed upward.

41.     During the first week of May, 2014, Uranium Energy stock had dropped below $1.00 per share.  Within a matter of a few weeks, however, and "despite little-to-no material developments taking place within the company," the price of Uranium Energy shares nearly doubled, reaching a high of $1.92 per share during the week of May 27, 2014.  During the course of the Class Period, Uranium Energy either paid for or received the benefit from paid promotions that caused its stock to rise artificially.  The following graph illustrates the effect of undisclosed, paid promotion on the Company's common stock:

---

[5] Jonathan Sabatini, "3 Uranium Producers Worth Watching" (published on *SeekingAlpha.com*, May 27, 2014) (accessed at http://seekingalpha.com/article/2236803-3-uranium-producers-worth-watching) (attached hereto as Exhibit 2).



42.     One analyst was quick to raise concerns about the actual value of Uranium Energy. In an article published by *SeekingAlpha.com* on May 30, 2014,[6] Yash Bhatia opined that Uranium Energy "currently is one of Wall Street's highest-flying stocks, but shares are soaring for all the wrong reasons."  Bhatia claimed that "recent [promotional] articles, videos and other marketing materials," such as "insignificant press releases disseminated by the company that do not change the business's intrinsic value," were "the main reason for the recent increase in share prices" for the Company.

43.     Bhatia's claims found support even in the promotional materials that touted Uranium Energy stock.  Despite its oft-repeated assertions concerning the supposed imminent need to meet "the world's overwhelming demand for more uranium," Uranium Energy continued to postpone production at its Palangana mine, which it claimed was based on an "underlying strategy"

---

[6] *See* http://seekingalpha.com/article/2245713-uranium-energy-soars-on-hype-danger-of-a-significant-pullback (attached hereto as Exhibit 3).

to "proactively reduce[] production" "due to low uranium prices," and with the intention that it would "increase production and maximize profits by selling" when "market conditions improve."

44.     In fact, similar concerns about the true value of Uranium Energy, in the face of the Company's own vigorous, self-promotional campaign efforts, had been raised before.   In a February 1, 2013 article published on *hotStocked.com*,[7] Martin Tsvetkov, citing a "paid advertising campaign running in favour of UEC" that had been published by Shazam Stocks, argued that "what we are witnessing here is a company which has practically initiated promotional coverage on its own stock."   After noting that Defendant Adnani had recently been "busy" "selling shares and exercising corporate options and warrants," Tsvetkov suggested that the ultimate aim of this promotional campaign was to "ramp up" the price of Uranium Energy shares and, thus, "potentially pave the way for further insider trading."   The author was unconvinced, however, that the temporary price boost would be sustainable in light of Shazam Stocks' "historical promo picks and how they performed both within the corresponding campaign and in the aftermath."

45.     With no positive developments relating to the intrinsic value of Uranium Energy, the only events that could cause its share prices to rise so substantially were its undisclosed, paid promotional campaigns.   As shown in detail below, nothing distinguished Uranium Energy from its competitors in the "junior" uranium production industry or the broader market, but its undisclosed, paid promotional scheme.

46.     In fact, Bhatia and Tsvetkov had barely scratched the surface of an ongoing, multi-layered scheme by which Uranium Energy sought to pump its stock under the guise of widely circulated "newsletters" and "alerts" authored by seemingly objective analysts and observers.   As

---

[7] *See* https://www.hotstocked.com/article/44432/and-the-pump-initiator-is-shazamstocks-powered.html (attached hereto as Exhibit 4).

detailed below, the Company had engaged in a concerted effort from June 2011 through February 2015 to conceal the true source of these promotional materials and to persuade the investing public that information being presented was coming from parties not affiliated with Uranium Energy. Although these materials purported to provide investors with detailed "disclaimers" alongside the investing guidance and updates, in fact they gave readers little or no notice that the information came, directly or indirectly, from Uranium Energy. Lengthy, fine-print disclosures appearing at the very end of the materials contained buried references to a wide variety of entities that had no apparent connection to Uranium Energy. The hidden truth, however, was that Uranium Energy had paid, directly or indirectly, approximately 30 different entities to publicize its stock.

47. From at least June of 2013, through April of 2015, UEC—either directly or through its affiliate, Brazil Resources or UEC's financial public relations firm, Raven Consulting— retained promotional agents, including (1) Action Media, (2) Fin Media Networks ("Fin Media"), (3) Future Money Trends LLC ("Future Money Trends"), (4) Red Rock, (5) Shazam Stocks, (6) Stock Gumshoe, (7) Venture Cap Group ("Venture"), (8) *TooNiceStocks.com*, (9) *InvestorSoup.com*, (10) *TheHotPennyStocks.com*, (11) *StockPreacher.com*, (12) *MicroStockProfit.com*, (13) *TheLightningPicks.com*, (14) *LuckyStockPicks.com*, (15) *StockProfessors.com*, (16) *USAMarketNews.com*, and (17) *PennyStockShark.com,* to tout its stock.

48. Upon retention, UEC's agents conducted a massive promotional campaign on behalf of UEC, which included the publication of no fewer than forty articles, newsletters, or email "alerts" in various social media outlets.

49. Indeed, since as early as June, 2011, Defendants had engaged in a sustained and costly paid-promotional campaign that directly and materially affected the price of Uranium Energy's common stock.

16

## SCHEME TO DEFRAUD

*June 2013 Promotions*

50.     On June 7, 2013, *TooNiceStocks.com* published the first in a series of three newsletters concerning UEC.  *See TooNiceStocks.com*, "Uranium Energy Corp. (NYSE: UEC) Technical Pull Backs Offer Opportunities!" (6/7/13) (attached hereto as Exhibit 5); *TooNiceStocks.com*, "Next Technical Leg Approaching for Uranium Energy Corp." (6/20/13) (attached hereto as Exhibit 6); *TooNiceStocks.com*, "Be Ready – Next Technical Leg Approaching for Uranium Energy Corp." (6/25/13) (attached hereto as Exhibit 7).  The first of these newsletters, published on June 7, 2013, touted UEC as an "impressive emerging growth company" that should be kept "on top of your radar from here on out!"  Ex. 5.  It claims that "there is no other prettier, more impressive or bullish breakout chart out there in the entire market," and that "technical guru websites have been screaming about how well UEC has been doing."  *Id.*  It cites a current Buy rating from *barchart.com,* an "impressive," "bullish breakout" chart for UEC that appears on *stockcharts.com*, and a series of video interviews featuring UEC's CEO, Amir Adnani, and UEC board member and former Energy Secretary Spencer Abraham.  *Id.*  The newsletter then cites the presence of large institutional investors, UEC's substantial cash reserves and inventory, and large global demand for uranium as key factors supporting investment in UEC.  *Id.*  The newsletter claims that UEC is "well positioned to capitalize on the world's overwhelming demand for more uranium, for more energy, for cheaper energy and for a cleaner environment," and asserts that UEC's technical and managerial expertise are able to take advantage of this position for the benefit of the company's shareholders.  *Id.*

51.     The second *TooNiceStocks.com* newsletter was published on June 20, 2013.  It provides a short update to the earlier June 7 newsletter.  Ex. 6.  It asserts that recent developments

in the market for UEC stock reflect that "technical eyes are looking for cheap shares to accumulate," and that "UEC continues to look strong." *Id.* It reminds investors that "UEC is a NYSE-AMEX listed company" that "just last year raised a massive financing at a much higher price to an institutional investor!" *Id.* It closes by urging investors to "[k]eep UEC on top of your radar from here on out!" *Id.*

52.     On June 25, 2013, *TooNiceStocks.com* published its third and final newsletter on UEC. Ex. 7. This newsletter opens by stating that "[w]e continue our long term coverage on UEC and stand by our last update." *Id.* It then proceeds to duplicate much of the contents of the second, with the only new information apparently being updated trading data. *Id.*

53.     Each of the three June 2013 newsletters includes a lengthy disclaimer containing the following text: "*TooNiceStocks.com* expects to be compensated up to sixty thousand dollars to provide one month of commercial/digital advertising and business rand media marketing by a third party Fin Media Networks."[8] Exs. 5, 6, & 7. The disclaimer, however, fails to disclose that *TooNiceStocks.com* had been compensated by UEC, directly or indirectly, for publishing the January 31, 2013 advertisement.

54.     This promotional blitz had the effect that Defendants and the promoters intended. The price of Uranium Energy common stock closed at $1.07 on June 7, 2013. Without any material change in the Company's operating or financial circumstances, it closed at $1.34 on June 28, 2013, an increase in the price of the Company's common stock directly attributable to the paid promotional scheme, during June, 2013, of 25%.

---

[8] The lengthy disclaimer appearing in each June 2013 newsletter also makes the following disclosure: "*TooNiceStocks.com* has been previously been [sic] compensated sixty thousand dollars to provide one week of commercial/digital advertising and business brand media marketing by a third party Venture Cap Group." Exs. 5, 6 & 7.

55.     Over the same period, the other junior uranium producer that traded on U.S. exchanges did not fair nearly so well.  On May 1, 2014, Uranerz Energy Corp. ("URZ") traded at $1.49 per share; on May 28, 2014, it closed at $1.57 per share, a gain of 5.4%.  On May 1, 2014, 2015, Uranium Resources, Inc. ("URRE") traded at $2.66 per share; on May 28, 2014, it closed at $2.67 per share, a small gain of 0.3%.  On May 1, 2014, UR-Energy, Inc. ("URG") traded at $1.16 per share; on May 28, 2014, it closed at $1.24 per share, a gain of 7%.  On May 1, 2014, Energy Fuels, Inc. ("UUUU") traded at $7.74; on May 28, 2014, it closed at $8.00, a gain of 8%.  At the same time, the broader market, as represented by the S&P Index, rose from 1,883.68 to 1,909.78, and increase of 1.4%.  Nothing but undisclosed paid promotions explains the vast difference between the rise in Uranium Energy's per share price and the performance of industry competitors or the broader market.

*May 2014 Promotions*

56.     In May, 2014, Raven Consulting, through a number of its wholly-owned subsidiaries, published an alert concerning UEC stock in several different media outlets on several different dates.  *See LuckyStockPicks.com*, "NYSE (UEC) – Hot Stock Alert!!" (5/18/14) (attached hereto as Exhibit 8); *StockProfessors.com*, "NYSE (UEC) – Hot Stock Alert!!" (5/18/14) (attached hereto as Exhibit 9); *USAMarketNews.com*, "(UEC) – NYSE Break-Out Stock!?" (5/18/14) (attached hereto as Exhibit 10); *StockProfessors.com*, "UEC" (5/19/14) (attached hereto as Exhibit 11); *PennyStockShark.com*, "UEC" (5/29/14) (attached hereto as Exhibit 12); *LuckyStockPicks.com*, "UEC" (5/30/14) (attached hereto as Exhibit 13).  Published on May 18 and 30, 2014 by *LuckyStockPicks.com*, on May 18 and 19, 2014 by *StockProfessors.com*, on May 18, 2014 by *USAMarketNews.com*, and on May 29, 2014 by *PennyStockShark.com*, the alert claims that UEC "is a HOT Stock" that is "flying up the charts."  Exs. 8—13.  It urges investors to "put

it on your RADAR" since "multiple factors are driving UEC higher." *Id.* The alert contains a link to a "recent interview on Bloomberg News" and proclaims that "UEC went from exploration to production in less than 6 years." *Id.* Citing investments made by Rick Rule and Li Ka-shing ("the Richest man in all of Asia"), the alert claims that "UEC looks poised to be a contender as the Uranium market rebounds!" *Id.*

57.     The May 2014 alert contains a small-print disclaimer at the end, providing that the outlet "is a wholly owned subsidiary of Raven Consulting Corp.," which "expects to be compensated $5,000.00 cash for this UEC advertising and promotion by UEC directly."[9] Exs. 8—13. The disclaimer, however, fails to disclose that the "wholly owned subsidiaries" of Raven Consulting, *LuckyStockPicks.com*, *StockProfessors.com*, *USAMarketNews.com* and/or *PennyStockShark.com* had been compensated by UEC, directly or indirectly, for publishing the January 31, 2013 advertisement and in what amount.

58.     Once again, Defendants' paid promotional blitz had the effect that Defendants and the promoters intended. The price of Uranium Energy common stock closed at $1.04 on May 1, 2014. Without any material change in the Company's operating or financial circumstances, it closed at $1.91 on May 28, 2014, before settling down somewhat to close at $1.75 on May 30, 2014, an increase in the price of the Company's common stock directly attributable to the paid promotional scheme during May, 2014, of 68%.

59.     Over the same period, the other junior uranium producer that traded on U.S. exchanges did not fair nearly so well. On May 1, 2014, URZ traded at $1.49 per share; on May 28, 2014, it closed at $1.57 per share, a gain of 5.4%. On May 1, 2014, 2015, URRE traded at

---

[9] The May 29, 2014 publication by *PennyStockShark.com* and the May 30, 2014 publication by *LuckyStockPicks.com* also included a disclosure that the outlet "has previously been compensated $5000.00 directly from UEC." Exs. 12 & 13.

$2.66 per share; on May 28, 2014, it closed at $2.67 per share, a small gain of 0.3%. On May 1, 2014, URG traded at $1.16 per share; on May 28, 2014, it closed at $1.24 per share, a gain of 7%. On May 1, 2014, UUUU traded at $7.74; on May 28, 2014, it closed at $8.00, a gain of 8%. At the same time, the broader market, as represented by the S&P Index, rose from 1,883.68 to 1,909.78, and increase of 1.4%. Nothing but undisclosed paid promotions explains the vast difference between the rise in Uranium Energy's per share price and the performance of industry competitors or the broader market.

### November 2014 Promotions

60.     On November 10, 2014, Red Rock published an alert on *LuckyStockPicks.com* that UEC was the "#1 Play Today!!"  *See LuckyStockPicks.com*, "(UEC) #1 NYSE Play Today!!" (11/10/14) (attached hereto as Exhibit 14).  The November 10, 2014 alert claims that UEC "looks posed to be a major contender as the uranium market rebounds," having "caught fire" while "absolutely flying up the charts the past week."  Ex. 14.  It provides that "multiple factors are driving UEC higher and t[r]ending positively," and urges investors to rely on the fact that "UEC went from exploration to production in less than 6 years," while "attracting investors like Rick Rule and Li Ka-shing (the richest man in all of Asia)."  *Id.*

61.     According to the disclaimer accompanying the November 10, 2014 alert, Red Rock was engaged by Brazil Resources to provide UEC advertising and promotional services, and was compensated "up to $5,000 cash" for such services.  Ex. 14.  Red Rock's disclosure that it received compensation is buried in small print and in the middle of a 23-line paragraph found at the end of the very end of the alert, near the bottom of the page.  *Id.*  The disclaimer, however, fails to disclose that Red Rock and/or *LuckyStockPicks.com* had been compensated by UEC, directly or indirectly, for publishing the January 31, 2013 advertisement.

62.     On November 10, 2014, Action Media published a newsletter authored by Michael Reef that appeared in a number of media outlets, including *InvestorSoup.com*, *TheHotPennyStocks.com*, *StockPreacher.com*, *MicroStockProfit.com*, and *TheLightningPicks.com*.  *See TheLightningPicks.com*, "UEC Just Hit Critical Mass!" (11/10/14) (attached hereto as Exhibit 15); *InvestorSoup.com*, "UEC Just Hit Critical Mass!" (11/10/14) (attached hereto as Exhibit 16); *TheHotPennyStocks.com*, "UEC Just Hit Critical Mass!" (11/10/14) (attached hereto as Exhibit 17); *MicroStockProfit.com*, "The UEC Chart is Glowing Green!" (11/10/14) (attached hereto as Exhibit 18); *StockPreacher.com*, "The UEC Chart is Glowing Green!" (11/10/14) (attached hereto as Exhibit 19).  The November 10, 2014 newsletter seeks to portray uranium stocks generally, and UEC stock particularly, as being poised for a "big vertical takeoff" after "bottoming out" in the aftermath of the 2011 Fukushima nuclear disaster. Exs. 15-19.  The Reef newsletter argues that "uranium play has come back to life," with industry stock prices having already "come back 30%," and that UEC in particular seems to be "clearly in play."  *Id.*  UEC, according to Reef, has "at least 30 million pounds of uranium concentrate lurking in its dirt," which, even at a "depressed" price of $36/pound, would mean "a cool $1 billion in future sales."  *Id.*  The newsletter predicts that, "[s]ooner or later, the stockpiles [of uranium] will be gone, Japan will OK new plants and uranium prices can spike back toward pre-Fukushima highs," which the newsletter promises will be "double where they are now!"  *Id.*  These expected developments, in turn, will prompt UEC to "start mining again," which is how UEC "makes its money."  *Id.*

63.     Raven Consulting retained Action Media to provide "advertising and promotional services" for UEC, in exchange for which Action Media received $22,500.  Exs. 15—19.  The November 10, 2014 newsletter published in the various Action Media-owned outlets contains a

"Disclaimer," which appears at the very end of the publication in fine print and contains two paragraphs. *Id.* Buried in the first paragraph of the 12-line, two-paragraph Disclaimer is the disclosure that each of the media outlets "is wholly owned by Action Media Holdings Corp.," and that Action Media "has been compensated Twenty Two Thousand Five Hundred Dollars by Raven Consulting Corp. (a non-controlling third party) for UEC advertising and promotional services." *Id.* The disclaimer, however, fails to disclose that Action Media, *InvestorSoup.com*, *TheHotPennyStocks.com*, *StockPreacher.com*, *MicroStockProfit.com* and/or *TheLightningPicks.com* had been compensated by UEC, directly or indirectly, for publishing the January 31, 2013 advertisement.

64.     On November 12, 2014, *FutureMoneyTrends.com* published another newsletter, entitled, "Where I am Looking for My Next 10 Bagger" (11/12/14) (attached hereto as Exhibit 20). In this newsletter, Mr. Ameduri informs *FutureMoneyTrends.com* members that they are witnessing the "dawn of the uranium bull market," as uranium has been "rallying big" "since September" and is continuing to "attract high-quality people," such as former U.S. Senator and Energy Secretary Spencer Abraham leading the UEC advisory board. Ex. 20. He also emphasizes UEC's identity as a "low-cost producer" that stands to benefit handsomely from "rising" "demand" and with uranium becoming "more important than ever to our society." *FutureMoneyTrends.com* advises its members that UEC has "scale[d] back production" at its Palangana mine to "wait for uranium prices to rise further in order to maximize profits." *Id.* Therefore, according to Mr. Ameduri, investors who are "looking to own shares of an advanced-stage business in the junior resources market need to put [UEC] at the top of their list." *Id.*

65.     The November 12, 2014 newsletter published by Future Money Trends includes a "Legal Notice" substantially similar to the one included in the September 2014 newsletters and

discloses that "[w]e have entered into an Investor Relations agreement with the company which includes, marketing coverage, video production, travel, speaking at conferences, and our analysis distributed to our members.  For this program we have been directly compensated by Uranium Energy a total of up to eighty seven thousand dollars and twenty thousand shares."  Ex. 20.

66.     Yet again, Defendants' paid promotional blitz had the effect that Defendants and the promoters intended.  The price of Uranium Energy common stock closed at $1.11 on November 3, 2014.  Without any material change in the Company's operating or financial circumstances, it closed at $1.94 on November 20, 2014, before settling down somewhat to close at $1.74 on November 28, 2014, an increase in the price of the Company's common stock directly attributable to the paid promotional scheme, during November, 2014, of 57%.

67.     Over the same period, the other junior uranium producer that traded on U.S. exchanges did not fair nearly so well.  On November 3, 2014, URZ traded at $0.92 per share; on November 28, 2014, it closed at $1.25 per share, a healthy gain 35%.  Similarly, on November 3, 2014, 2015, URRE traded at $1.56 per share; on November 28, 2014, it closed at $2.04 per share, another healthy gain of 31%.  On the other hand, on November 3, 2014, URG traded at $0.80 per share; on November 28, 2014, it closed at $0.85 per share, a small gain of 6.3%.  On November 3, 2014, UUUU traded at $6.19 per share; on November 28, 2014, it closed at $7.00, a gain of 13%.  At the same time, the broader market, as represented by the S&P Index, fell from 2,017.81 to 2,067.56, a gain of 2.5%.  Nothing but undisclosed paid promotions explains the vast difference between the rise in Uranium Energy's per share price and the performance of industry competitors or the broader market.

***April, 2015 Promotions***

68.     On April 17, 2015, *StockGumshoe.com* published an article entitled, "Looking Into the Energy Inner Circle Teaser Pitch About the Shortfall in Uranium Supply and an Imminent Price Spike" (4/17/15) (attached hereto as Exhibit 21).  The article discusses, summarizes, and quotes extensively from the "teaser pitch" that Dr. Kent Moors, who styles himself as an Internationally recognized expert in oil and natural gas policy, risk management, emerging markets, economic development, and market risk assessment," had been "pushing" "very heavily" to investors beginning on April 16, 2015.

69.     According to the *StockGumshoe.com* article, Moors argues in his "teaser pitch" that the "upcoming electricity crisis" provides a compelling reason to invest in nuclear energy and uranium.  In exchange for the "sale" price of $1,995,[10] Moors "will share with you his four uranium investments," one of which (Cameco Corporation) he gives away for free.  According to the *StockGumshoe.com*, Uranium Energy is one of the three "secret" picks that Moors details to his subscribers.  Moors relies on Uranium Energy's associations with wealthy, successful investors like Li Ka-Shing ("the richest man in Asia") and Rick Rule ("the noted resources investment bank"), as well as prominent industry figures such as "former US Energy Secretary" Spencer Abraham, whom Moors mistakenly refers to as Uranium Energy's "Chairman"), in support of his argument that investment in the Company is a savvy move.  Moors also touts Uranium Energy's corporate "infrastructure" and its ability to "raise about $625 million" after going public at the "peak of the last uranium boom in 2007" as justifying an investment in the Company.  The April

---

[10] The current price, as of the date of this filing, of a one-year subscription to "The Energy Inner Circle" is $4,000. *See* https://purchases.moneymappress.com/ECLLEV2RT/WECLR902/index.htm?pageNumber=2&src=subscribe_btns&h=true&link_source=html&vidTime= (attached hereto as Exhibit 22).

17, 2015 article contains a link to Moors' "The Energy Inner Circle" site, from which a subscription to Moors' work may be purchased.

70.     Generally, legitimate stock analysts charge a significant premium for their investment analysis and recommendations.  The fact that the April 17, 2015 Stock Gumshoe article quotes extensively from this expensive report, which was made available to the investing public for approximately $2,000, suggests that there exists some undisclosed agreement for the promotion of Uranium Energy stock.  This inference is strengthened by the fact that the Stock Gumshoe article contains a link to the subscription site from which Moors' work may be purchased, and that Stock Gumshoe, according to the terms of its own disclaimer, receives compensation from the publisher of Moors' work for each visit the site receives from the article's link, as detailed below.

71.     The April 17, 2015 article published by *StockGumshoe.com* contains a disclosure at the bottom which states, in pertinent part, that "Stock Gumshoe is supported by subscribers and by sponsors and advertisers.  Stock Gumshoe's employee authors will disclose holdings in any stock covered at time of publication and will not trade in any stocks written about for at least three days after publication.   Please see below for complete disclosure, disclaimer and policy information."[11]  The "complete" Disclaimer, in turn, states, in pertinent part, that "Stock Gumshoe may receive compensation based on reader behavior in relation to advertisements, including payment for leads, purchases, or clicks/site visits made by Stock Gumshoe visitors, in addition to or instead of direct payment for the placement of the ad."[12]  Neither the short disclosure below the April 17, 2015 article nor the linked Disclaimer, however, discloses that Stock Gumshoe had been

---

[11] *See http://www.stockgumshoe.com/reviews/energy-inner-circle/the-electricity-crisis-that-dr-kent-moors-says-could-bring-100000-returns/* (attached hereto as Exhibit 23).
[12] *See http://www.stockgumshoe.com/disclaimer/* (attached hereto as Exhibit 24).

compensated by Uranium Energy, directly or indirectly, for publicizing Moors' efforts to promote investment in the Company's stock.

72.     Upon clicking the link to Moors' "The Energy Inner Circle" site, as of the date of this filing, one is informed that "this offer is no longer available," but that one may obtain "more information about *The Energy Inner Circle*" by simply "contact[ing] our VIP Trading Services Team."   If, however, one instead navigates directly to "The Energy Inner Circle" website, a message dated April 2015 from Moors appears.   Moors' message invites the reader to "JOIN NOW" and subscribe to "The Energy Inner Circle."   Below the April 2015 invitation from Moors is a fine-print disclaimer, which states in pertinent part that Moors' work is "based on SEC filings, current events, interviews, corporate press releases, and what we've learned as financial journalists."[13]   The disclaimer fails to disclose that either Moors or Money Map Press, which publishes "The Energy Inner Circle," received any compensation in connection with its promotion of Uranium Energy stock.

73.     Yet again, Defendants' paid promotions had the effect that Defendants and the promoters intended.   On April 16, 2015, the day before the Company's latest promotional blitz, the per share price of Uranium Energy common stock closed at $1.48.   Without any material change in the Company's operating or financial circumstances, it closed at $2.99 on May 29, 2015, before settling down somewhat to close at $2.60 on June 17, 2015, the last day of the Class Period. From mid-April through mid-June, 2015, therefore, as a direct result of Defendants' paid promotional scheme, the price of the Company's common stock rose by nearly 76%.

---

[13] *See* *http://pro.moneymappress.com/ECLLEV2RT/WECLR902/?src=subscribe_btns-welcome&h=true* (attached as Exhibit 25).

74.     Over the same period, the other junior uranium producer that traded on U.S. exchanges did not fair nearly so well.  On April 16, 2015, URZ traded at $1.08 per share; on June 17, 2015, it closed at $1.11 per share, a gain of less than 3%.  On April 16, 2015, URRE traded at $1.22 per share; on June 17, 2015, it closed at $1.17 per share, a loss of 4%.  On April 16, 2015, URG traded at $0.90 per share; on June 17, 2015, it closed at $0.85 per share, a loss of 5.5%.  On April 16, 2015, UUUU traded at $4.48; on June 17, 2015, it closed at $4.40, a loss of 1.8%.  At the same time, the broader market, as represented by the S&P Index, fell from 2,104.99 to 2,100.44, a decline of 0.2%.  Nothing but undisclosed paid promotions explains the vast difference between the rise in Uranium Energy's per share price and the performance of the broader market or industry competitors.

## FALSE AND MISLEADING STATEMENTS

75.     On June 10, 2013, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended April 30, 2013.  Beginning on page 38, the April 30, 2013 10-Q included a section, titled "Risks Related to Our Common Stock," detailing risks related to Uranium Energy's common stock, stating:

> Risks Related to the Company's Common Stock
>
> Historically, the market price of our common stock has been and may continue to fluctuate significantly.
>
> On September 28, 2007, our common stock commenced trading on the NYSE MKT Equities Exchange (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board. The global stock markets have experienced significant and increased volatility, especially over the last few years. Although this volatility is often unrelated to specific company performance, it can have an adverse effect on the market price of our common stock. Historically, the market price of our common stock has fluctuated significantly, and may continue to do so in the future.

In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, development or production activities, including abandonment of key uranium projects; (v) sales of a large number of our common stock held by certain stockholders including institutions and insiders; (vi) downward revisions to estimates on us by securities analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

During the recent past, the global markets have been impacted by the effects of mass sub-prime mortgage defaults and liquidity problems of the asset-backed commercial paper market, which have resulted in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing.

Historically, we have relied on equity financing as our primary source of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing stockholders and reduce the market value of their investment.

Issuances of our common stock for additional financing, mergers and acquisitions and for other reasons may result in significant dilution to our existing stockholders, including a reduction in the proportionate ownership and voting power and a decrease in the market price of our common stock. We also filed a Form S-3 "Shelf" Registration Statement that became effective September 2, 2011

which provides for the offer and sale of certain securities of the Company from time to time, at its discretion, up to an aggregate public offering of $50 million of which approximately $22.5 million has been utilized.

76.     The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Uranium Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

77.     In addition, in the April 30, 2013 10-Q, the Company stated the following about "Related Party Transactions:"

> During the three and nine months ended April 30, 2013, the Company had transactions with certain officers and directors of the Company as follows:
>
> Incurred $42,409 and $126,323 (three and nine months ended April 30, 2012: $39,455 and $90,315) in general and administrative costs paid to a company controlled by a direct family member of a current officer; and
> Incurred $9,000 and $27,000 (three and nine months ended April 30, 2012: $Nil) in consulting fees paid to a company controlled by a current director of the Company.

78.     The foregoing statements about related party transaction are false and misleading. Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, their related-party disclosure in the April 30, 2013 10-Q omitted critical information about the related party transaction, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

79.     On October 15, 2013, the Company filed with the SEC its Annual Report on Form 10-K for the year ending July 31, 2013 ("2013 10-K").  Beginning on page 18, Defendants included a section, titled "Risks Related to Our Common Stock," stating:

> Risks Related to Our Common Stock
>
> Historically, the market price of our common stock has been and may continue to fluctuate significantly.
>
> On September 28, 2007, our common stock commenced trading on the NYSE MKT Equities Exchange (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.
>
> The global markets have experienced significant and increased volatility, especially over the recent past, which have been impacted by the effects of mass sub-prime mortgage defaults and liquidity problems of the asset-backed commercial paper market, resulting in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.
>
> In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and most recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 86,032,285 shares were issued and outstanding as of July 31, 2013. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We also filed a Form S-3 "Shelf" Registration Statement that became effective September 2, 2011 which provides for the offer and sale of certain securities of the Company from time to time, at its discretion, up to an aggregate public offering of $50 million of which approximately $22.5 million has been utilized.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be

an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

If the NYSE MKT delists our common stock, investors may face material adverse consequences, including, but not limited to, a lack of trading market for our securities, reduced liquidity, decreased analyst coverage of our securities, and an inability for us to obtain additional financing to fund our operations.

80.     The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company funds a scheme to boost Uranium Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

81.     In addition, in the 2013 10-K, the Company disclosed the following about "Related Party Transactions:"

Related Party Transactions

Except as described below, the Company was not involved in any transactions during the fiscal year ended July 31, 2013, and is not involved in any currently proposed transaction, in which the Company was or is to be a participant and the amount involved exceeds $120,000 in which related persons had or will have a direct or indirect material interest:

incurred $176,099 in general and administrative costs paid to a company controlled by a direct family member of a current officer and director (Mr. Adnani).

Our Audit Committee is charged with reviewing and approving all related party transactions and reviewing and making recommendations to the board of directors, or approving any

contracts or other transactions with any of our current or former
executive officers. The charter of the Audit Committee sets forth the
Company's written policy for the review of related party
transactions.

82.    The foregoing statements about related party transaction are false and misleading.
Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17
C.F.R. § 229.404, their related-party disclosure in the April 30, 2013 10-Q omitted critical
information about the related party transaction, including "the name of the related person and the
basis on which the person is a related person," "the related person's interest in the transaction with
the registrant," and "the approximate dollar value of the amount of the related person's interest in
the transaction."

83.    Between November 19, 2013 and November 25, 2013, the Company filed with the
SEC a Registration Statement on Form S-3 ("Registration Statement") – that Defendants Adnani
and Katsumata signed – and a Prospectus on Form 424B3, concerning the registration of over 3
million shares related to a Credit Agreement dated July 30, 2013.  Both the Registration Statement
and the Prospectus incorporated by reference the 2013 10-K and both included identical section,
titled "Risks Related to Our Common Stock," detailing risks related to Uranium Energy's common
stock and stating:

Risks Related to Our Common Stock

Historically, the market price of our common stock has been and
may continue to fluctuate significantly.

On September 28, 2007, our common stock commenced trading on
the NYSE MKT (formerly known as the American Stock Exchange
and the NYSE Amex Equities Exchange) and prior to that, traded on
the OTC Bulletin Board.

The global markets have experienced significant and increased
volatility, especially over the recent past, which have been impacted
by the effects of mass sub-prime mortgage defaults and liquidity

34

problems of the asset-backed commercial paper market, resulting in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.

In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima, Japan in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and most recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 89,666,520 shares were issued and outstanding as of November 15, 2013. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants

and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We also filed a Form S-3 "Shelf" Registration Statement that became effective September 2, 2011 which provides for the offer and sale of certain securities of the Company from time to time, at its discretion, up to an aggregate public offering of $50 million, of which approximately $34.4 million has been utilized (approximately $22.5 million pursuant to an offering of shares on April 10, 2012, approximately $7.1 million pursuant to an offering of units consisting of shares and warrants on October 23, 2013, and approximately $4.8 million representing the aggregate exercise price to purchase warrant shares upon exercise of the warrants issued as part of such units).

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

If the NYSE MKT delists our common stock, investors may face material adverse consequences, including, but not limited to, a lack of trading market for our securities, reduced liquidity, decreased

analyst coverage of our securities, and an inability for us to obtain
additional financing to fund our operations.

84.     The foregoing disclosures concerning risk relating to the Company's common stock
were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly
disregarded that they set in motion and fueled with Company funds a scheme to boost Uranium
Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning
the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its
common stock relating to the paid-promotions scheme.

85.     In addition, both the Registration Statement and the Prospectus that the Company
filed with the SEC on in late November, 2013, incorporated by reference Uranium Energy's 2013
10-K.  The 2013 10-K disclose information about related party transaction, including that The
Company disclosed that during Fiscal 2013, the Company "incurred $176,099 in general and
administrative costs paid to a company controlled by a direct family member of a current officer;
and incurred $36,000 in consulting fees paid to a company controlled by a current director of the
Company."

86.     The foregoing statements about related party transaction are false and misleading.
Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17
C.F.R. § 229.404, their related-party disclosure in the 2013 10-K, incorporated by reference into
the September 5, 2014 Registration Statement and Prospectus omits critical information about the
related party transaction, including "the name of the related person and the basis on which the
person is a related person," "the related person's interest in the transaction with the registrant,"
and "the approximate dollar value of the amount of the related person's interest in the transaction."

87.     On December 9, 2013, the Company filed with the SEC a Quarterly Report on Form
10-Q for the period ended October 31, 2013.  Beginning on page 40, the October 31, 2013 10-Q

included a section, titled "Risks Related to Our Common Stock," detailing risks related to Uranium

Energy's common stock, stating:

> Risks Related to Our Common Stock

> Historically, the market price of our common stock has been and may continue to fluctuate significantly.

> On September 28, 2007, our common stock commenced trading on the NYSE MKT (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.

> The global markets have experienced significant and increased volatility, especially over the recent past, which have been impacted by the effects of mass sub-prime mortgage defaults and liquidity problems of the asset-backed commercial paper market, resulting in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.

> In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima, Japan in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 89,611,281 shares were issued and outstanding as of October 31, 2013. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We also filed a Form S-3 "Shelf" Registration Statement that became effective September 2, 2011 which provides for the offer and sale of certain securities of the Company from time to time, at its discretion, up to an aggregate public offering of $50 million, of which approximately $34.4 million has been utilized (approximately $22.5 million pursuant to an offering of shares on April 10, 2012, approximately $7.1 million pursuant to an offering of units consisting of shares and warrants on October 23, 2013, and approximately $4.8 million representing the aggregate exercise price to purchase warrant shares upon exercise of the warrants issued as part of such units).

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the

NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

If the NYSE MKT delists our common stock, investors may face material adverse consequences, including, but not limited to, a lack of trading market for our securities, reduced liquidity, decreased analyst coverage of our securities, and an inability for us to obtain additional financing to fund our operations.

88.     The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

89.     In addition, in the 2013 10-K, the Company disclosed the following about "Related Party Transactions:"

RELATED PARTY TRANSACTIONS

During the three months ended October 31, 2013, the Company had transactions with certain officers and directors of the Company as follows:

Incurred $37,403 (three months ended October 31, 2012: $48,433) in general and administrative costs paid to a company controlled by a direct family member of a director and officer; and

40

Incurred $9,000 (three months ended October 31, 2012: $9,000) in consulting fees paid to a company controlled by a director of the Company.

At October 31, 2013, amounts due to related parties totaled $9,354 (July 31, 2013: $9,571). These amounts are unsecured, non-interest bearing and due on demand.

90.     The foregoing statements about related party transaction are false and misleading. Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, their related-party disclosure in the April 30, 2013 10-Q omitted critical information about the related party transaction, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

91.     On March 12, 2014, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended January 31, 2014.  Beginning on page 40, the March 12, 2014 10-Q included a section, titled "Risks Related to Our Common Stock," detailing risks related to Uranium Energy's common stock, stating:

Risks Related to Our Common Stock

Historically, the market price of our common stock has been and may continue to fluctuate significantly.

On September 28, 2007, our common stock commenced trading on the NYSE MKT (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.

The global markets have experienced significant and increased volatility, especially over the recent past, which have been impacted by the effects of mass sub-prime mortgage defaults and liquidity problems of the asset-backed commercial paper market, resulting in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and

any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.

In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima, Japan in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 89,792,727 shares were issued and outstanding as of January 31, 2014. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate

ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We previously filed a Form S-3 "Shelf" Registration Statement effective September 2, 2011 (the "Shelf") providing for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate amount of $50 million. A total of $34.4 million of the Shelf was utilized through public offers and sales of shares and units ($22.5 million in gross proceeds through an offering of the Company's shares on April 10, 2012, $7.1 million in gross proceeds through an offering of units consisting of the Company's shares and share purchase warrants on October 23, 2013, and $4.8 million representing the aggregate exercise price of those share purchase warrants should they be exercised in full). We filed a further registration statement effective December 31, 2013 providing for the public offer and sale of certain securities of the Company representing an additional 20%, or $3.1 million, of the then remaining $15.6 million available under the Shelf, which increased the remaining amount available under the Shelf to $18.7 million.

On December 31, 2013, we filed a prospectus supplement under the Shelf providing for the public offer and sale of the Company's shares having an aggregate offering price of up to $18.7 million through one or more "at-the-market" offerings pursuant to a Controlled Equity OfferingSM Sales Agreement effective December 31, 2013 between Cantor Fitzgerald & Co., as sales agent, and the Company (the "Sales Agreement"). At January 31, 2014, no public offer or sale of the Company's shares was completed under the Sales Agreement.

Additionally, we filed a second Form S-3 "Shelf" Registration Statement effective January 10, 2014 providing for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate offering of $100 million.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion,

the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

92.     The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

93.     In addition, in the March 12, 2014 10-Q, the Company disclosed the following about "Related Party Transactions:"

RELATED PARTY TRANSACTIONS

During the three and six months ended January 31, 2014, the Company had transactions with certain officers and directors of the Company as follows:

incurred $36,237 and $73,640 (three and six months ended January 31, 2013: $35,481 and $83,914) in general and administrative costs paid to a company controlled by a direct family member of a director and officer; and

incurred $9,000 and $18,000 (three and six months ended January 31, 2013: $9,000 and $18,000) in consulting fees paid to a company controlled by a director of the Company.

At January 31, 2014, amounts due to related parties totaled $8,611 (July 31, 2013: $9,571). These amounts are unsecured, non-interest bearing and due on demand.

94.    The foregoing statements about related party transaction are false and misleading. Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, their related-party disclosure in the April 30, 2013 10-Q omitted critical information about the related party transaction, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

95.    On June 9, 2014, the Company filed with the SEC the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended April 30, 2014.  Beginning on page 47, the June 9, 2014 10-Q included a section, titled "Risks Related to Our Common Stock," detailing risks related to Uranium Energy's common stock, stating:

Risks Related to Our Common Stock

Historically, the market price of our common stock has been and may continue to fluctuate significantly.

On September 28, 2007, our common stock commenced trading on the NYSE MKT (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.

The global markets have experienced significant and increased volatility in the past, resulting in liquidity problems of the asset-backed commercial paper market and a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an

adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.

In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima, Japan in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 90,467,764 shares were issued and outstanding as of April 30, 2014. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We previously filed a Form S-3 Shelf Registration Statement effective September 2, 2011 (the Shelf) providing for the public

offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate amount of $50 million. A total of $34.4 million of the Shelf was utilized through public offers and sales of shares and units ($22.5 million in gross proceeds through an offering of the Company's shares on April 10, 2012, $7.1 million in gross proceeds through an offering of units consisting of the Company's shares and share purchase warrants on October 23, 2013, and $4.8 million representing the aggregate exercise price of those share purchase warrants should they be exercised in full). We filed a further registration statement effective December 31, 2013 providing for the public offer and sale of certain securities of the Company representing an additional 20%, or $3.1 million, of the then remaining $15.6 million available under the Shelf, which increased the remaining amount available under the Shelf to $18.7 million.

On December 31, 2013, we filed a prospectus supplement under the Shelf providing for the public offer and sale of the Company's shares having an aggregate offering price of up to $18.7 million through one or more at-the-market offerings pursuant to a Controlled Equity OfferingSM Sales Agreement effective December 31, 2013 between Cantor Fitzgerald & Co., as sales agent, and the Company (the Sales Agreement). At April 30, 2014, no public offer or sale of the Company's shares was completed under the Sales Agreement.

Additionally, we filed a second Form S-3 Shelf Registration Statement effective January 10, 2014 providing for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate offering of $100 million.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE

> MKT's listing requirements; if an issuer's common stock sells at
> what the NYSE MKT considers a low selling price and the issuer
> fails to correct this via a reverse split of shares after notification by
> the NYSE MKT; or if any other event occurs or any condition exists
> which makes continued listing on the NYSE MKT, in its opinion,
> inadvisable.

96.     The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

97.     In addition, in the June 9, 2014 10-Q, the Company disclosed the following about "Related Party Transactions:"

> RELATED PARTY TRANSACTIONS
>
> During the three and nine months ended April 30, 2014, the
> Company had transactions with certain officers and directors of the
> Company as follows:
>
> incurred $37,176 and $110,815 (three and nine months ended April
> 30, 2013: $42,409 and $126,323) in general and administrative costs
> paid to a company controlled by a direct family member of a director
> and officer; and
>
> incurred $9,000 and $27,000 (three and nine months ended April 30,
> 2013: $9,000 and $27,000) in consulting fees paid to a company
> controlled by a director of the Company.
>
> At April 30, 2014, amounts due to related parties totaled $8,703
> (July 31, 2013: $9,571). These amounts are unsecured, non-interest
> bearing and due on demand.

98.     The foregoing statements about related party transaction are false and misleading. Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17

48

C.F.R. § 229.404, their related-party disclosure in the April 30, 2013 10-Q omitted critical information about the related party transaction, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

99.     On September 5, 2014, the Company filed with the SEC a Registration Statement on Form S-3 ("Registration Statement") – that Defendants Adnani and Katsumata signed – and a Prospectus on Form 424B3 ("Prospectus"), concerning the resale from time to time of up to 199,755 shares of Uranium Energy common stock the Company issued pursuant to an Amended and Restated Credit agreement dated March 13, 2014.  Both the Registration Statement and the Prospectus included identical section, titled "Risks Related to Our Common Stock," detailing risks related to Uranium Energy's common stock, stating:

> Risks Related to Our Common Stock
>
> Historically, the market price of our common stock has been and may continue to fluctuate significantly.
>
> On September 28, 2007, our common stock commenced trading on the NYSE MKT (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.
>
> The global markets have experienced significant and increased volatility in the past, resulting in liquidity problems of the asset-backed commercial paper market and a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.

In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima, Japan in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 90,467,764 shares were issued and outstanding as of April 30, 2014. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We previously filed a Form S-3 Shelf Registration Statement effective September 2, 2011 (the "Shelf") providing for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate amount of $50 million. A total of $34.4 million of the Shelf was utilized through public offers and

sales of shares and units ($22.5 million in gross proceeds through an offering of the Company's shares on April 10, 2012, $7.1 million in gross proceeds through an offering of units consisting of the Company's shares and share purchase warrants on October 23, 2013, and $4.8 million representing the aggregate exercise price of those share purchase warrants should they be exercised in full).  We filed a further registration statement effective December 31, 2013 providing for the public offer and sale of certain securities of the Company representing an additional 20%, or $3.1 million, of the then remaining $15.6 million available under the Shelf, which increased the remaining amount available under the Shelf to $18.7 million.

On December 31, 2013, we filed a prospectus supplement under the Shelf providing for the public offer and sale of the Company's shares having an aggregate offering price of up to $18.7 million through one or more "at-the-market" offerings pursuant to a Controlled Equity OfferingSM Sales Agreement effective December 31, 2013 between Cantor Fitzgerald & Co., as sales agent, and the Company.  The Shelf expired on September 2, 2014 pursuant to Rule 415(a)(5) under the Securities Act.

We filed a second Form S-3 Shelf Registration Statement effective January 10, 2014 providing for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate offering of $100 million.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT.  In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders.  In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by

the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

100.    The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

101.    In addition, both the Registration Statement and the Prospectus that the Company filed with the SEC on September 5, 2014 incorporated by reference Uranium Energy's Annual Report on Form 10-K, for the period ended July 31, 2013, filed with the SEC on October 15, 2013 ("2013 10-K").  The 2013 10-K disclose information about related party transaction, including that The Company disclosed that during Fiscal 2013, the Company "incurred $176,099 in general and administrative costs paid to a company controlled by a direct family member of a current officer; and incurred $36,000 in consulting fees paid to a company controlled by a current director of the Company."

102.    The foregoing statements about related party transaction are false and misleading. Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, their related-party disclosure in the 2013 10-K, incorporated by reference into the September 5, 2014 Registration Statement and Prospectus omits critical information about the related party transaction, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

103.    On September 19, 2014, the Company filed with the SEC a Prospectus on Form

424B3, offering for sale shares of its common stock of the Company, "comprised of 1,859,524

Common Shares that may be issued from time to time upon exercise of outstanding common stock

purchase warrants . . . issued on October 23, 2013 pursuant to a registered public offering by the

Company."  Beginning on page 14, Defendants included a section, titled "Risks Related to Our

Common Stock," stating:

> Risks Related to Our Common Stock
>
> Historically, the market price of our common stock has been and
> may continue to fluctuate significantly.
>
> On September 28, 2007, our common stock commenced trading on
> the NYSE MKT (formerly known as the American Stock Exchange
> and the NYSE Amex Equities Exchange) and prior to that, traded on
> the OTC Bulletin Board.
>
> The global markets have experienced significant and increased
> volatility in the past, resulting in liquidity problems of the asset-
> backed commercial paper market and a number of large financial
> institutions requiring government bailouts or filing for bankruptcy.
> The effects of these past events and any similar events in the future
> may continue to or further affect the global markets, which may
> directly affect the market price of our common stock and our
> accessibility for additional financing. Although this volatility may
> be unrelated to specific company performance, it can have an
> adverse effect on the market price of our shares which, historically,
> has fluctuated significantly and may continue to do so in the future.
>
> In addition to the volatility associated with general economic trends
> and market conditions, the market price of our common stock could
> decline significantly due to the impact of any one or more events,
> including, but not limited to, the following: (i) volatility in the
> uranium market; (ii) occurrence of a major nuclear incident such as
> the events in Fukushima, Japan in March 2011; (iii) changes in the
> outlook for the nuclear power and uranium industries; (iv) failure to
> meet market expectations on our exploration, pre-extraction or
> extraction activities, including abandonment of key uranium
> projects; (v) sales of a large number of our shares held by certain
> stockholders including institutions and insiders; (vi) downward
> revisions to previous estimates on us by analysts; (vii) removal from

market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 90,467,764 shares were issued and outstanding as of April 30, 2014. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We previously filed a Form S-3 "Shelf" Registration Statement effective September 2, 2011 (the "Shelf") providing for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate amount of $50 million. A total of $34.4 million of the Shelf was utilized through public offers and sales of shares and units ($22.5 million in gross proceeds through an offering of the Company's shares on April 10, 2012, $7.1 million in gross proceeds through an offering of units consisting of the Company's shares and share purchase warrants on October 23, 2013, and $4.8 million representing the aggregate exercise price of those share purchase warrants should they be exercised in full). We filed a further registration statement effective December 31, 2013 providing for the public offer and sale of certain securities of the Company representing an additional 20%, or $3.1 million, of the then remaining $15.6 million available under the Shelf, which increased the remaining amount available under the Shelf to $18.7 million.

On December 31, 2013, we filed a prospectus supplement under the Shelf providing for the public offer and sale of the Company's shares having an aggregate offering price of up to $18.7 million through one or more at-the-market offerings pursuant to a Controlled Equity OfferingSM Sales Agreement effective December 31, 2013 between Cantor Fitzgerald & Co., as sales agent, and the Company The Shelf expired on September 2, 2014 pursuant to Rule 415(a)(5) under the Securities Act.

We filed a second Form S-3 Shelf Registration Statement effective January 10, 2014 providing for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate offering of $100 million.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a low selling price and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

If the NYSE MKT delists our common stock, investors may face material adverse consequences, including, but not limited to, a lack of trading market for our securities, reduced liquidity, decreased analyst coverage of our securities, and an inability for us to obtain additional financing to fund our operations.

104.    The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

105.    In addition, both the September 19, 2014 Prospectus incorporated by reference Uranium Energy's Annual Report on Form 10-K, for the period ended July 31, 2013, filed with the SEC on October 15, 2013 ("2013 10-K").  The 2013 10-K disclose information about related party transaction, including that The Company disclosed that during Fiscal 2013, the Company "incurred $176,099 in general and administrative costs paid to a company controlled by a direct family member of a current officer; and incurred $36,000 in consulting fees paid to a company controlled by a current director of the Company."

106.    The foregoing statements about related party transaction are false and misleading. Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, their related-party disclosure in the 2013 10-K, incorporated by reference into the September 19, 2014 Prospectus omits critical information about the related party transaction, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

107.    On October 14, 2014, the Company filed with the SEC its Annual Report on Form 10-K for the year ending July 31, 2014 ("2014 10-K").  Beginning on page 18, Defendants included a section, titled "Risks Related to Our Common Stock," stating:

Risks Related to Our Common Stock

Historically, the market price of our common stock has been and may continue to fluctuate significantly.

On September 28, 2007, our common stock commenced trading on the NYSE MKT Equities Exchange (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.

The global markets have experienced significant and increased volatility in the past, and have been impacted by the effects of mass sub-prime mortgage defaults and liquidity problems of the asset-backed commercial paper market, resulting in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.

In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in

our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 90,966,558 shares were issued and outstanding as of July 31, 2014. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We filed a Form S-3 "Shelf" Registration Statement, which was declared effective on January 10, 2014. This "Shelf" Registration Statement provides for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate offering amount of $100 million.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

> If the NYSE MKT delists our common stock, investors may face
> material adverse consequences, including, but not limited to, a lack
> of trading market for our securities, reduced liquidity, decreased
> analyst coverage of our securities, and an inability for us to obtain
> additional financing to fund our operations.

108.    The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

109.    In addition, in the 2014 10-K, Defendants disclosed that FX had "incurred $152,090 in general and administrative costs paid to a company controlled by a direct family member of a current officer (Mr. Adnani)."

110.    The foregoing statements about related party transaction are false and misleading. Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, their related-party disclosure in the 2014 10-K omits critical information about the related party transaction, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

111.    On December 10, 2014, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended October 31, 2014 ("December 2014 10-Q").  Beginning on page 39, Defendants included a section, titled "Risks Related to Our Common Stock," stating:

> Risks Related to Our Common Stock

Historically, the market price of our common stock has been and may continue to fluctuate significantly.

On September 28, 2007, our common stock commenced trading on the NYSE MKT Equities Exchange (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.

The global markets have experienced significant and increased volatility in the past, and have been impacted by the effects of mass sub-prime mortgage defaults and liquidity problems of the asset-backed commercial paper market, resulting in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.

In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to

secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 91,529,711 shares were issued and outstanding as of October 31, 2014. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We filed a Form S-3 "Shelf" Registration Statement, which was declared effective on January 10, 2014. This "Shelf" Registration Statement provides for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate offering amount of $100 million.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

> If the NYSE MKT delists our common stock, investors may face material adverse consequences, including, but not limited to, a lack of trading market for our securities, reduced liquidity, decreased analyst coverage of our securities, and an inability for us to obtain additional financing to fund our operations.

112.    The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

113.    Also in the December 2014 10-Q, Defendants disclosed that, "[d]uring the three months ended October 31, 2014, the Company incurred $39,134 (three months ended October 31, 2013: $37,403) in general and administrative costs paid to a company controlled by a direct family member of a director and officer."  They also disclosed that FX had "issued 15,000 restricted shares with a fair value of $18,150 for the services received."  Uranium Energy further disclosed that, "[d]uring the three months ended October 31, 2013, the Company incurred $9,000 in consulting fees paid to a company controlled by a former director of the Company."

114.    The foregoing statements about Uranium Energy's related-party disclosures in the December 2014 10-Q is false and misleading because Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, they omitted "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

115.    On January 9, 2015, the Company filed with the SEC a Registration Statement on Form S-8 ("S-8") Registering up to 7.5 million shares, issuable under the Company's 2014 Stock Incentive Plan.  Beginning on page P-12, Defendants included a section, titled "Risks Related to Our Common Stock," stating:

> Risks Related to Our Common Stock
>
> Historically, the market price of our common stock has been and may continue to fluctuate significantly.
>
> On September 28, 2007, our common stock commenced trading on the NYSE MKT Equities Exchange (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.
>
> The global markets have experienced significant and increased volatility in the past, and have been impacted by the effects of mass sub-prime mortgage defaults and liquidity problems of the asset-backed commercial paper market, resulting in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.
>
> In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 91,529,711 shares were issued and outstanding as of October 31, 2014. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We filed a Form S-3 "Shelf" Registration Statement, which was declared effective on January 10, 2014. This "Shelf" Registration Statement provides for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate offering amount of $100 million.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT.  In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders.  In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the

issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

If the NYSE MKT delists our common stock, investors may face material adverse consequences, including, but not limited to, a lack of trading market for our securities, reduced liquidity, decreased analyst coverage of our securities, and an inability for us to obtain additional financing to fund our operations.

116.    The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

117.    In addition, the S-8, incorporated by reference the 2014 10-K in which Defendants disclosed that FX had "incurred $152,090 in general and administrative costs paid to a company controlled by a direct family member of a current officer (Mr. Adnani)."

118.    The foregoing statements about related party transaction are false and misleading. Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, their related-party disclosure in the 2014 10-K omits critical information about the related party transaction, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

119.   On March 12, 2015, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended January 31, 2015.  Beginning on page 41, Defendants included a section, titled "Risks Related to Our Common Stock," stating:

> Risks Related to Our Common Stock
>
> Historically, the market price of our common stock has been and may continue to fluctuate significantly.
>
> On September 28, 2007, our common stock commenced trading on the NYSE MKT Equities Exchange (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.
>
> The global markets have experienced significant and increased volatility in the past, and have been impacted by the effects of mass sub-prime mortgage defaults and liquidity problems of the asset-backed commercial paper market, resulting in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.
>
> In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as the events in Fukushima in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 91,891,620 shares were issued and outstanding as of January 31, 2015. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We filed a Form S-3 "Shelf" Registration Statement, which was declared effective on January 10, 2014. This "Shelf" Registration Statement provides for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate offering amount of $100 million.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be

an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

If the NYSE MKT delists our common stock, investors may face material adverse consequences, including, but not limited to, a lack of trading market for our securities, reduced liquidity, decreased analyst coverage of our securities, and an inability for us to obtain additional financing to fund our operations.

120.    The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions.  Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

121.    Also in the March 12, 2015 10-Q, Defendants disclosed that "[d]uring the three and six months ended January 31, 2015, the Company incurred $33,524 and $72,658 (three and six months ended January 31, 2014: $36,237 and $73,640), respectively, in general and administrative costs paid to a company controlled by a direct family member of a director and officer."  The Company also disclosed that, "during the six months ended January 31, 2015, the Company issued 15,000 restricted shares to this company for consulting services with a fair value of $18,150 included in general and administrative costs."  Uranium Energy further disclosed that, "[d]uring the three and six months ended January 31, 2014, the Company incurred $9,000 and $18,000, respectively, in consulting fees paid to a company controlled by a former director of the Company."

122.   The foregoing statements about Uranium Energy's related-party disclosure in its March 12, 2015 10-Q is false and misleading because Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, they omitted "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

123.   On June 9, 2015, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended April 30, 2015.  Beginning on page 43, Defendants included a section, titled "Risks Related to Our Common Stock," stating:

> Risks Related to Our Common Stock
>
> Historically, the market price of our common stock has been and may continue to fluctuate significantly.
>
> On September 28, 2007, our common stock commenced trading on the NYSE MKT Equities Exchange (formerly known as the American Stock Exchange and the NYSE Amex Equities Exchange) and prior to that, traded on the OTC Bulletin Board.
>
> The global markets have experienced significant and increased volatility in the past, and have been impacted by the effects of mass sub-prime mortgage defaults and liquidity problems of the asset-backed commercial paper market, resulting in a number of large financial institutions requiring government bailouts or filing for bankruptcy. The effects of these past events and any similar events in the future may continue to or further affect the global markets, which may directly affect the market price of our common stock and our accessibility for additional financing. Although this volatility may be unrelated to specific company performance, it can have an adverse effect on the market price of our shares which, historically, has fluctuated significantly and may continue to do so in the future.
>
> In addition to the volatility associated with general economic trends and market conditions, the market price of our common stock could decline significantly due to the impact of any one or more events, including, but not limited to, the following: (i) volatility in the uranium market; (ii) occurrence of a major nuclear incident such as

the events in Fukushima in March 2011; (iii) changes in the outlook for the nuclear power and uranium industries; (iv) failure to meet market expectations on our exploration, pre-extraction or extraction activities, including abandonment of key uranium projects; (v) sales of a large number of our shares held by certain stockholders including institutions and insiders; (vi) downward revisions to previous estimates on us by analysts; (vii) removal from market indices; (viii) legal claims brought forth against us; and (ix) introduction of technological innovations by competitors or in competing technologies.

A prolonged decline in the market price of our common stock could affect our ability to obtain additional financing which would adversely affect our operations.

Historically, we have relied on equity financing and more recently, on debt financing, as primary sources of financing. A prolonged decline in the market price of our common stock or a reduction in our accessibility to the global markets may result in our inability to secure additional financing which would have an adverse effect on our operations.

Additional issuances of our common stock may result in significant dilution to our existing shareholders and reduce the market value of their investment.

We are authorized to issue 750,000,000 shares of common stock of which 92,434,424 shares were issued and outstanding as of April 30, 2015. Future issuances for financings, mergers and acquisitions, exercise of stock options and share purchase warrants and for other reasons may result in significant dilution to and be issued at prices substantially below the price paid for our shares held by our existing stockholders. Significant dilution would reduce the proportionate ownership and voting power held by our existing stockholders, and may result in a decrease in the market price of our shares.

We filed a Form S-3 "Shelf" Registration Statement, which was declared effective on January 10, 2014. This "Shelf" Registration Statement provides for the public offer and sale of certain securities of the Company from time to time, at our discretion, up to an aggregate offering amount of $100 million.

We are subject to the Continued Listing Criteria of the NYSE MKT and our failure to satisfy these criteria may result in delisting of our common stock.

70

Our common stock is currently listed on the NYSE MKT. In order to maintain this listing, we must maintain certain share prices, financial and share distribution targets, including maintaining a minimum amount of shareholders' equity and a minimum number of public shareholders. In addition to these objective standards, the NYSE MKT may delist the securities of any issuer if, in its opinion, the issuer's financial condition and/or operating results appear unsatisfactory; if it appears that the extent of public distribution or the aggregate market value of the security has become so reduced as to make continued listing on the NYSE MKT inadvisable; if the issuer sells or disposes of principal operating assets or ceases to be an operating company; if an issuer fails to comply with the NYSE MKT's listing requirements; if an issuer's common stock sells at what the NYSE MKT considers a "low selling price" and the issuer fails to correct this via a reverse split of shares after notification by the NYSE MKT; or if any other event occurs or any condition exists which makes continued listing on the NYSE MKT, in its opinion, inadvisable.

If the NYSE MKT delists our common stock, investors may face material adverse consequences, including, but not limited to, a lack of trading market for our securities, reduced liquidity, decreased analyst coverage of our securities, and an inability for us to obtain additional financing to fund our operations.

124. The foregoing disclosures concerning risk relating to the Company's common stock were false and misleading because, as stated above in ¶¶ 51-75, Defendants knew or recklessly disregarded that they set in motion and fueled with Company cash a scheme to boost Uranium Energy's stock price artificially through paid promotions. Having disclosed these risks concerning the Company's common stock, Defendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme.

125. In the June 9, 2015 10-Q, the Company disclosed that, "[d]uring the three and nine months ended April 30, 2015, the Company incurred $45,443 and $118,101 (three and nine months ended April 30, 2014: $37,176 and $110,815), respectively, in general and administrative costs paid to a company controlled by a direct family member of a director and officer." The Company also disclosed that, "during the nine months ended April 30, 2015, the Company issued 15,000

restricted shares to this company for consulting services with a fair value of $18,150 included in general and administrative costs."  Uranium Energy further disclosed that, "[d]uring the three and nine months ended April 30, 2014, the Company incurred $9,000 and $27,000, respectively, in consulting fees paid to a company controlled by a former director of the Company."

126.    The foregoing statements about Uranium Energy's related-party disclosure in its June 2015 10-Q is false and misleading because Defendants knew or recklessly disregarded that, in violation of SEC Regulation S-K, Item 404, 17 C.F.R. § 229.404, they omitted "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount of the related person's interest in the transaction."

## THE TRUTH EMERGES

127.    On June 18, 2015, *TheStreetSweeper.org* ("TSS") published an article online,[14] claiming that Uranium Energy was using undisclosed, paid stock promotions to increase the value of Uranium Energy shares.  The TSS article stated in part that "UEC has been running up on promotions coming from Twitter, Seeking Alfa authors and reportedly hype paid by the company itself."

128.    One June 2, 2015 Twitter post from "IknowFirst," the TSS article reported, promoted UED as up 102.78% "since our last article."  TSS highlighted a *SeekingAlpha.com* article, titled "Uranium Energy Corp. Will Ride the Uranium Bull."

129.    According to a report by *hotstocked.com*, quoted in the article above, Uranium Energy has caused to be published at least eight separate stock promotions, for which the

---

[14] *See* http://www.smarteranalyst.com/2015/06/18/uranium-energy-corporation-nysemktuec-the-bad-news-buried-in-the-recent-sale/ (attached hereto as Exhibit 26).

Company, or third parties controlled by the Company, paid over $200,000. Some of the stock promotion campaigns, from promoters named "LightningStockPicks," "Micro Stock Profit," "InvestorSoup.com," "The Penny Stocks Finder," "Stock Preacher," and "Future Money Trends" include headlines such as "Chart Is Glowing Green! (UEC) #1 NYSE Play Today," "UEC Just Hit Critical Mass," and "(UEC) #1 NYSE Play Today."

130.    As a result of this news, shares of Uranium Energy fell $0.18 or over 6.9% on unusually heavy volume, to as close at $2.42 on June 18, 2015.

131.    On the following day the Company issued a press release, denying the allegations and stating that the article published by *TheStreetSweeper.org* had no merit.  The Company's release, however, did not address the allegations related to the undisclosed paid stock promotions and market was unconvinced.  The release stated:

> Uranium Energy Corp (NYSE MKT: UEC, the "Company" or "UEC") is responding to recent press releases relying on the unfounded allegations of a third party.
>
> The subject press releases have absolutely no merit and are comprised of unfounded allegations made by a third party whose motives are questionable. The Company has reviewed the referenced article. The Company's SEC disclosure is very clear and we will not comment further on the possibility of groundless, frivolous litigation. UEC is in discussions with counsel with a view to doing whatever is necessary to bring these parties' motives to light and to seek such legal and equitable relief and any and all damages suffered by the Company and any of its shareholders as a consequence of these unfounded allegations.

132.    As a result of this news, shares of Uranium Energy continued to fall, dropping $0.62 or over 25.6% on unusually heavy volume, to as close at $1.80 on June 19, 2015. Over two trading days, shares fell $0.80 or over 30.7%.

133.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

134.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Uranium Energy securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

135.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Uranium Energy securities were actively traded on NYSE MKT, an exchange for small-cap companies, "designed to support younger, high-growth companies." While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Uranium Energy or its transfer agent maintains a list of record owners, enabling it to identify other members of the Class and to issue notice of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

136.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

137.    Lead Plaintiffs' will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

138.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

    (b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Uranium Energy;

    (c)    whether the Individual Defendants caused Uranium Energy to issue false and misleading financial statements during the Class Period;

    (d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

    (e)    whether the prices of Uranium Energy securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

    (f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICATION OF PRESUMPTION
## OF RELIANCE: FRAUD ON THE MARKET

97.     Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine.  At all relevant times, the market for Uranium Energy common stock was efficient for the following reasons, among others:

(a)     For most of the Class Period, Uranium Energy's shares of common stock traded on the NYSE MKT;

(b)     As a regulated issuer, Uranium Energy filed periodic public reports with the SEC;

(c)     Uranium Energy regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

(d)     During the Class Period, the average daily trading volume in Uranium Energy's shares was 990,287 shares or weekly average trading volume of approximately 4,951,435 shares.  With a public float of approximately 84,567,870 million shares, 1.2% of the float traded daily and approximately 6% of the float trading weekly, establishing a strong presumption that the market for its stock was efficient;

(e)     New company specific information was rapidly reflected in the Company's stock price; and

76

(f)     During the Class Period, as many as one hundred forty (140) market makers made a market in the Company's stock.

98.     As a result of the foregoing, the market for Uranium Energy's common stock promptly digested current information regarding Uranium Energy from all publicly available sources and reflected such information in Uranium Energy's stock price.   Under these circumstances, all purchasers of Uranium Energy's common stock during the Class Period suffered similar injury through their purchase of Uranium Energy's common stock at artificially inflated prices, and a presumption of reliance applies. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

99.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

100.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

101.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Uranium Energy  securities during the Class Period.

103.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Uranium Energy securities. Plaintiffs and the Class would not have purchased Uranium Energy securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### SECOND CLAIM
#### Violation of Section 10(B) of the Exchange Act and
#### Rule 10b-5(a) and (c) Promulgated Thereunder against all Defendants

104.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

105.    During the Class Period, Defendants violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Uranium Energy publicly traded common stock during the Class Period as alleged herein.  Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Uranium Energy's common stock at artificially inflated prices.  In

furtherance of these unlawful schemes, plans and courses of conduct, Defendants, and each of them, took the actions set forth herein.

106.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock to maintain artificially high market prices for Uranium Energy's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

107.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct, including causing the publication of undisclosed, paid promotions. By paying for, approving, creating and/or publishing paid promotional materials without disclosing that Uranium Energy or its agents paid for the creation and dissemination of those materials, Defendants employed devices, schemes and artifices to defraud, engaged in acts, practices, and a course of conduct designed artificially to inflate the price of Uranium Energy common stock and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Uranium Energy common stock during the Class Period.

108.    Defendants knew of the devices, schemes, and artifices to defraud or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of supporting the artificially inflated price of Uranium Energy's securities.

109.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the

integrity of the market, they paid artificially inflated prices for Uranium Energy publicly traded securities. Plaintiffs and the Class would not have purchased Uranium Energy publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for Uranium Energy's common stock had been artificially inflated by Defendants' devices, schemes, and artifices to defraud.

### THIRD CLAIM
### Violation of Section 20(a) of the Exchange Act
### Against the Defendants Adnani and Katsumata and Uranium Energer

110.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

111.    Lead Plaintiffs sue Defendants Adnani and Katsumata herein as controlling persons of Uranium Energy and the Promoter Defendants.  Plaintiffs sue Defendant Uranium Energy as a controlling person of the Promoter Defendants.

112.    By virtue of their high-level positions, agency, and his ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, Defendants Adnani and Katsumata had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violators, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading.  In particular, Defendants Adnani and Katsumata had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

113.    In particular, Defendants named in this count had direct and supervisory involvement in the day-to-day operations of Uranium Energy and/or the Promoter Defendants and, therefore, are presumed to have had the power to control or influence the particular transactions

giving rise to the securities violations alleged herein.  Those Defendants exercised that power.

114.    As set forth above, Uranium Energy and the Promoter Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

115.    By virtue of his and its position as controlling persons, Defendants Adnani and Katsumata and Uranium Energy are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

116.    This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Mark Besendorfer and Robert Cramer as Lead Plaintiffs and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

117.    Plaintiffs hereby demand a trial by jury.

Dated: November 16, 2015                    Respectfully Submitted:

**THE BILEK LAW FIRM, L.L.P.**
Thomas E. Bilek
TX Bar # 02313525 / SDTX Bar # 9338
700 Louisiana, Suite 3950
Houston, Texas 77002
(713) 227-7720

***Liason Counsel for the Proposed Class***

**THE ROSEN LAW FIRM, P.A.**

/s/ Keith R. Lorenze
Jacob Goldberg
Keith R. Lorenze
TX Bar #24046313 / SDTX Bar #621638
101 Greenwood Avenue, Suite 440
Jenkintown, PA  19046
T: (215) 600-2817
F: (212) 202-3827
Email: jgoldberg@rosenlegal.com
         klorenze@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Philip Kim
275 Madison Avenue, 34th Floor
New York, NY  10016
T: (212) 686-1060
F: (212) 202-3827
Email: lrosen@rosenlegal.com
         pkim@rosenlegal.com

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt
Adam M. Apton
1101 30th Street NW, Suite 115
Washington, DC 20007
T: (202) 524-4290
F: (202) 333-2121
Email: nporritt@zlk.com
       aapton@zlk.com

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Class*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on November 16, 2015, I electronically filed the foregoing ***Amended***

***Class Action Complaint*** with the Clerk of Court using the CM/ECF system, which will send

notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Keith R. Lorenze*
Keith R. Lorenze
101 Greenwood Avenue, Suite 203
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***