United States District Court
Southern District of Texas
**ENTERED**
July 15, 2016
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HEATHER M. STEPHENS, Individually and | § | |
| On Behalf of All Others Similarly Situated, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-15-1862 |
| | § | |
| URANIUM ENERGY CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Uranium Energy Corporation advertised its stock by paying third-party promoters to circulate positive articles, newsletters, and email alerts touting its financial strength and prospects for future growth. In this putative class action, investors allege that the advertising campaign, and the failure adequately to disclose it in SEC filings, violated the federal securities laws. The lead plaintiff, Heather Stephens, sued Uranium Energy; its cofounder, president, and CEO, Amir Adnani; its CFO, Mark Katsumata; and the third-party promoters, Raven Consulting Corp., LuckyStockPicks.com, Brazil Resources, Inc., Red Rock Media Group, Inc., Action Holdings, Inc., and Stock Gumshoe, Inc. Stephens asserted claims under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78pp, and sought to represent purchasers of Uranium Energy's stock between June 7, 2013 and June 17, 2015.

Stephens filed an amended complaint alleging that all of the defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and that Uranium Energy, Adnani, and Katsumata violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (Docket Entry No. 28). She alleged that Uranium Energy's SEC disclosures misled investors by failing to

1

disclose that the promotional campaign increased the company's stock-price volatility and that the company had engaged in a "scheme" and "course of business" to conceal the extent of its involvement in the promotional campaign, including paying for the promotions, directly or otherwise.

The defendants moved to dismiss the amended complaint. (Docket Entry No. 31). They argued that the amended complaint failed to allege: (1) materially misleading omissions that the defendants had a duty to make; (2) facts giving rise to a strong inference of scienter; and (3) loss causation. They also argued that the amended complaint failed to allege a fraudulent "scheme." Uranium Energy, Adnani, and Katsumata argued that they lacked the ability to control the omissions and violations alleged, defeating § 20(a) liability. Stephens responded, the defendants replied, and the court heard oral argument. (Docket Entry Nos. 38, 41, 45, 46).

Based on the pleadings, the motions and responses, the applicable law, and counsels' arguments, the court grants the defendants' motion to dismiss. This action is dismissed with prejudice because the pleading has already been amended and the governing law makes further amendment futile.

The reasons for this ruling are set out below.

I.      **Background**

A.      **The Alleged Fraud: An Alleged "Pump" Scheme Without any "Dump"**

Uranium Energy is a Vancouver-based uranium exploration-and-production company. It owns the mineral rights to uranium-mining projects in Arizona, Colorado, New Mexico, Texas, Wyoming, and Paraguay. (Docket Entry No. 28 at ¶ 30). The company also owns and operates a Texas-based uranium mine that extracts and processes uranium oxide for sale to nuclear power

plants.  (*Id.* at ¶¶ 30–33).

Uranium companies faced record-low prices in the wake of the 2011 Fukushima, Japan nuclear disaster, which drastically reduced interest in nuclear power.  Uranium Energy turned to third-party advertisers to try to increase investor confidence and the stock price.  (*Id.* at ¶¶ 3–5, 40).  The company's CEO, Amir Adnani, cofounded two of the third-party promotional companies Uranium Energy used.  In 2004, Adnani and Alan Lindsay, his father-in-law, cofounded Blender Media.  Lindsay also served as Uranium Energy's board chair and as a director.  (*Id.* at ¶ 37).  Adnani's brother, Arash, is Blender Media's president, and his brothers-in-law, Oliver-Barret Lindsay and John Lindsay, are co-owners.  (*Id.*).  Adnani also founded Brazil Resources, which retained Red Rock Media, an advertising company that "provide[d] advertising and promotional services for the benefit of Uranium Energy."  (*Id.* at ¶ 39).  In addition to Adnani's companies, Uranium Energy worked with an unaffiliated financial public-relations firm, Raven Consulting, to create and distribute the promotional pieces.  (*Id.* at ¶ 47).

The amended complaint alleged that Uranium Energy paid, "directly or indirectly, approximately 30 different entities to publicize its stock" with a "massive promotional campaign" involving at least 40 online advertisements.  (*Id.* at ¶¶ 46–48).  The third-party promoters released these advertisements in "waves" in four different months: June 2013, May 2014, November 2014, and April 2015.  (*Id.* at ¶¶ 47, 50–74).  Each advertisement was styled using the "guise of widely circulated 'newsletters' and 'alerts' authored by seemingly objective analysts and observers" when, in fact, "the information came, directly or indirectly, from Uranium Energy."  (*Id.* at ¶ 46).  Each advertisement relayed positive information about Uranium Energy's stock, encouraging readers to invest.  In short, the amended complaint alleged a scheme to "pump" the stock price without any

corresponding sale, or "dump," at the inflated prices.[1]

The amended complaint acknowledged that all (but one, addressed below) of the advertisements included a disclaimer stating that the third-party promoter had been paid to promote Uranium Energy stock and disclosing how much. The amended complaint alleged that the disclaimers were, however, incomplete and set out in small print, "buried," and intended to be overlooked.

The advertisements are in the record.[2] The disclaimers included variations on the theme that these were paid advertisements, not objective investment advice. The disclaimers warned that the advertisements were "intended for commercial advertising, business media marketing, and . . . informational purposes only"; were "neither [offers] nor recommendation[s] to buy or sell any security"; were produced under "an investor relations agreement with the [promoted] company which includes marketing coverage, video production, travel, speaking at conferences, and . . . analysis"; or were "commercial advertisement[s] . . . not intended to be investment advice." (Docket Entry No. 28 at ¶¶ 50, 52, 56–59, 62–63, 64–65).

Some of the advertisements included disclaimers stating that Uranium Energy itself had paid for the advertisement. Other advertisements had disclaimers identifying a different company as the compensation source, without disclosing the relationship of that company to Uranium Energy. (*Id.* at ¶ 46). The amended complaint alleged that Uranium Energy "engaged in a concerted effort . . .

_____

[1] There is a suggestion of a limited amount of insider selling, but the record provides no support, as discussed in footnote 5.

[2] Four of the 17 advertisements are reproduced below in the Appendix. Stephens attached the advertisements to her amended complaint. Neither side disputes that the advertisements may be properly considered on a motion to dismiss. And as explained below in Part II, the case law permits reliance on these documents at the pleading stage.

to conceal the true source of these promotional materials and to persuade the investing public that information being presented was coming from parties not affiliated with Uranium Energy." (*Id.*). The amended complaint alleged that after each "wave," Uranium Energy's stock-price increase outpaced the price of similarly situated uranium stocks and of the broader market. (*Id.* at ¶ 41). It was only "[i]n the absence of paid promotional activities [that] Uranium Energy's stock plummeted, resetting itself to track more closely to the fortunes of its industry and broader markets." (*Id.* at ¶ 5). According to the amended complaint, the advertisements increased Uranium Energy's stock-price volatility and concealed the fact that the company's fundamentals were unsound.

### 1.    The June 2013 Promotions

In June 2013, TooNiceStocks.com published three articles about Uranium Energy.  These articles stated that Uranium Energy was an "impressive emerging growth company" that should be "on top of your radar from here on out!"; continued "to look strong" and "just last year raised a massive financing at a much higher price to an institutional investor!"; and was "well positioned to capitalize on the world's overwhelming demand for more uranium." (*Id.* at ¶¶ 50–52).

A disclaimer accompanying each article provided the following information:

> Please remember that this newsletter is intended for commercial advertising, business media marketing and is for informational purposes only. . . . From time to time [TooNiceStocks.com is] compensated for commercial advertising and business media marketing or providing [its] own independent research coverage and opinions. . . . TooNiceStocks.com expects to be compensated up to sixty thousand dollars to provide one month of commercial/digital advertising and business brand media marketing by a third party[,] Fin Media Networks.  TooNiceStocks.com has been previously been [sic] compensated sixty thousand dollars to provide one week of commercial/digital advertising and business brand media marketing by a third party[,] VentureCap Group."

(Docket Entry No. 28, Exs. 5–7).

TooNiceStocks.com stated in each article that it had been paid for the articles and the

5

amount.  But the amended complaint alleged that the location, appearance, and content of the disclaimers effectively concealed them and negated their presence.  The disclaimers were allegedly "buried" because they were excessively long, were placed at the end of the articles, and were in small font.  The amended complaint alleged that although Uranium Energy indirectly paid for these advertisements through Fin Media, a Uranium Energy "promotional agent," the disclaimers did not state that Uranium Energy paid for the advertising or identify any affiliation of Fin Media Networks or VentureCap Group with Uranium Energy.  (*Id.* at ¶¶ 47, 53).

The amended complaint alleged that the June 2013 promotions caused Uranium Energy's stock price to increase by 25 percent.  (*Id.* at ¶ 54).  During that same period, other uranium producers allegedly saw stock-price increases of between 0.3 to 8 percent.  (*Id.* at ¶ 55).  The amended complaint alleged that "[n]othing but undisclosed paid promotions explains the vast difference between the rise in [Uranium Energy's] per share price and the performance of industry competitors or the broader market," and that once the advertisements stopped, the stock price fell. (*Id.* at ¶¶ 41, 55).

## 2.    The May 2014 Promotions

In May 2014, Raven Consulting published an "alert" about Uranium Energy on different websites, including LuckyStockPicks.com, StockProfessors.com, USAMarketNews.com, and PennyStockShark.com.  (*Id.* at ¶ 56).  The alert stated that Uranium Energy was a "HOT stock" that was "flying up the charts," and it urged investors to "put it on [their] RADAR" because Uranium Energy "looks poised to be a contender as the uranium market rebounds!"  (*Id.*).

A disclaimer appeared after each alert.  It included a statement identifying it as a "commercial advertisement" and warning that "[t]he information contained in [the] report . . . is not

intended to be investment advice." (Docket Entry No. 28, Exs. 8–13). Unlike the June 2013 advertisements, the disclaimers told investors that Uranium Energy had paid directly for the promotion. The disclaimers stated that the websites were "wholly owned subsidiar[ies] of Raven Consulting Corp.," which "expect[ed] to be compensated $5,000.00 cash for [the Uranium Energy] advertising and promotion by [Uranium Energy] directly." (*Id.*).

The amended complaint alleged that the May 2014 alerts caused Uranium Energy's stock price to increase by 68 percent, while other uranium producers saw stock-price increases of between 0.3 to 8 percent. (*Id.* at ¶¶ 58–59). The amended complaint again alleged that "[n]othing but undisclosed paid promotions explains the vast difference between the rise in [Uranium Energy's] per share price and the performance of industry competitors or the broader market," and that once the advertisements stopped, the stock price fell. (*Id.* at ¶¶ 41, 58–59).

### 3.    The November 2014 Promotions

In November 2014, third-party promoters Uranium Energy had retained published one alert and two newsletters. Red Rock Media, the advertising arm of Adnani's company, Brazil Resources, published an alert on LuckyStockPicks.com. (*Id.* at ¶ 60). The alert stated that Uranium Energy was "posed to be a major contender as the uranium market rebounds," had "caught fire," and was "absolutely flying up the charts the past week." (*Id.*). The alert had a disclaimer identifying it as an advertisement rather than objective investment information or advice. The disclaimer stated that Brazil Resources had paid Red Rock "up to $5,000 cash" to advertise Uranium Energy stock. (*Id.* at ¶ 61). The amended complaint alleged that Uranium Energy indirectly paid for the alert, but the disclaimer did not include this statement. (*Id.*). Nor did the disclaimer reveal that Uranium Energy's CEO was also Brazil Resources's founder.

7

Action Media also published a newsletter advertising Uranium Energy stock on five websites, InvestorSoup.com, TheHotPennyStocks.com, StockPreacher.com, MicroStockProfit.com, and TheLightningPicks.com.  (*Id.* at ¶ 62).  The newsletter stated that Uranium Energy was poised for "a big vertical takeoff" and was "clearly in play."  (*Id.*).  The newsletter's disclaimer stated that Raven Consulting paid Action Media $22,500 to advertise Uranium Energy.  (*Id.* at ¶ 63).  The amended complaint alleged that Uranium Energy indirectly paid for the newsletter, but the disclaimer did not include this statement.  (*Id.*).  Nor did the disclaimer reveal that Raven Consulting was Uranium Energy's public-relations firm.

FutureMoneyTrends.com published a newsletter advertising Uranium Energy as a "low-cost producer" that would benefit from "rising . . . demand."  (*Id.* at ¶ 64).  The newsletter advised investors "looking to own shares of an advanced-stage business in the junior resources market . . . to put [Uranium Energy] at the top of their list."  (*Id.*).  Unlike some of the others, the disclaimer included with the FutureMoneyTrends.com newsletter stated that the company had a public-relations agreement with Uranium Energy and had "been directly compensated by Uranium Energy a total of up to eighty seven thousand dollars and twenty thousand shares."  (*Id.* at ¶ 65).  The disclaimers appeared after the advertisements.  Stephens alleges that they were in small, gray-colored text, making them difficult to read.  (Docket Entry No. 28, Exs. 14–20).

The amended complaint alleged that the November 2014 promotions caused Uranium Energy's stock price to increase by 57 percent.  (*Id.* at ¶ 66).  During that same period, other uranium producers saw stock-price increases of between 6.3 to 35 percent.  (*Id.* at ¶ 67).  The amended complaint repeated the allegation that "[n]othing but undisclosed paid promotions explains the vast difference between the rise in [Uranium Energy's] per share price and the performance of

8

industry competitors or the broader market," and that once the advertisements stopped, the stock price fell.  (*Id.* at ¶¶ 41, 67).

### 4.        The April 2015 Article

In April 2015, StockGumshoe.com published an article that "discuss[ed], summarize[d], and quote[d] extensively" from a "teaser pitch" written by Dr. Kent Moors, "who styles himself as an internationally recognized expert in oil and natural gas policy, risk management, emerging markets, economic development, and market risk assessment."  (*Id.* at ¶ 68).  The article stated that Moors would sell information to investors about his top-four uranium-related stock "picks" for $1,995.  (*Id.* at ¶ 69).  The article then revealed that Uranium Energy was one of Moors's "secret" stock picks.  (*Id.*).  The article had a link to Moors's website, which solicited investors to pay to subscribe to receive his investment advice.  (*Id.*).  The article also quoted Moors's report to explain why Uranium Energy was a good investment.  According to the article, Moors's report stated that Uranium Energy had attracted "prominent industry figures" and had a strong "corporate infrastructure."  (*Id.*).

The article's disclaimer stated that "Stock Gumshoe may receive compensation based on reader behavior in relation to advertisements, including payment for leads, purchases, or clicks/site visits made by Stock Gumshoe visitors, in addition to or instead of direct payment for the placement of the ad."  (*Id.* at ¶ 71).  Unlike earlier promotions, the article did not state that Stock Gumshoe had been paid to publish it.

The amended complaint alleged that the article's reliance on Moors's $1,955 report "suggests that there exists some undisclosed agreement for the promotion of Uranium Energy stock."  (*Id.* at ¶ 70).  The amended complaint alleged that "[t]his inference is strengthened by the fact that the Stock Gumshoe article contains a link to the subscription site from which Moors's work may be

purchased, and that Stock Gumshoe, according to its own disclaimer, receives compensation from the publisher of Moors's work for each visit the site receives . . . ." (*Id.*). Like the Stock Gumshoe article, Moors's article did not have a disclaimer stating that he had been paid to write and publish his report. (*Id.* at ¶ 72).

The amended complaint alleged that the April 2015 promotions caused Uranium Energy's stock price to increase by 76 percent, while other uranium producers saw stock-price increases of less than 3 percent or decreases of between 1.8 and 5.5 percent. (*Id.* at ¶¶ 74–75). The amended complaint again alleged that "[n]othing but undisclosed paid promotions explains the vast difference between the rise in [Uranium Energy's] per share price and the performance of industry competitors or the broader market." (*Id.*).

### B.    The Allegedly Fraudulent Omissions

#### 1.    Omissions About Risks

The amended complaint alleged that Uranium Energy's SEC filings omitted material information about risks relating to Uranium Energy's common stock that misled investors. The amended complaint alleged that the following SEC filings were materially misleading: the June 2013, December 2013, March 2014, June 2014, December 2014, March 2015, and June 2015 Forms 10-Q, (*id.* at ¶¶ 75, 87, 91, 95, 111, 119, 123); the 2013 and 2014 Forms 10-K, (*id.* at ¶¶ 79, 107); the November 2013 and September 2014 Forms S-3, (*id.* at ¶¶ 83, 99); the September 2014 Form 424B3, (*id.* at ¶ 103); and the January 2015 Form S-8, (*id.* at ¶ 115).

In each of these public filings, Uranium Energy disclosed risks associated with investing in its common stock. The risks included "volatility in the uranium market," an "occurrence of a major nuclear incident," and "failure to meet market expectations on our exploration, pre-extraction, or

extraction activities." (*E.g.*, *id.* at ¶ 87).  None of the filings disclosed Uranium Energy's use of third-party promoters, its alleged "scheme" to flood the market with positive advertisements, or the potential effect on its stock-price volatility.  Stephens alleged that these disclosures were materially misleading because the "[d]efendants knew or recklessly disregarded that they set in motion and fueled with [Uranium Energy's] funds a scheme to boost Uranium Energy's stock price artificially through paid promotions." (*Id.* at ¶¶ 76, 80, 84, 88, 92, 96, 100, 104, 108, 112, 116, 120, 124).  She alleged that "[h]aving disclosed [some] risks concerning [Uranium Energy's] common stock, [the] [d]efendants were duty bound, but failed, to disclose the risk to its common stock relating to the paid-promotions scheme." (*Id.*).

### 2.    Omissions About Related-Party Transactions

In 1982, the SEC "adopted an integrated disclosure system [known as] Regulation S-K." THOMAS LEE HAZEN, 2 TREATISE ON THE LAW OF SECURITIES REGULATION § 9.38 (2016).  The agency "sought to define (1) what information is material in securities transactions, and (2) when and how such information should be disclosed to investors and the market." *Id.* (quotation marks omitted).  Among other information, Regulation S-K requires disclosure of any "related party transactions," known as "Item 404."  Item 404 requires an issuer to "[d]escribe any transaction . . . in which the registrant was or is to be a participant and the amount exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."  17 C.F.R. § 229.404(a).

The regulations define a "related person" as:

    a.    Any person who was in any of the following categories at any time during the specified period for which disclosure under paragraph (a) of this Item is required:

        i.    Any director or executive officer of the registrant;

    ii.    Any nominee for director, when the information called for by paragraph (a) of this Item is being presented in a proxy or information statement relating to the election of that nominee for director; or

    iii.    Any immediate family member of a director or executive officer of the registrant, or of any nominee for director when the information called for by paragraph (a) of this Item is being presented in a proxy or information statement relating to the election of that nominee for director, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such director, executive officer or nominee for director, and any person (other than a tenant or employee) sharing the household of such director, executive officer or nominee for director; and

b.    Any person who was in any of the following categories when a transaction in which such person had a direct or indirect material interest occurred or existed:

    i.    A security holder covered by Item 403(a) (§ 229.403(a)); or

    ii.    Any immediate family member of any such security holder, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law of such security holder, and any person (other than a tenant or employee) sharing the household of such security holder.

*Id.* § 229.404, Instruction 1.

The amended complaint alleged that Uranium Energy's Item 404 disclosures omitted material information the SEC regulations required, including "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount involved in the transaction." *Id.* § 229.404(a)(1)–(3); (Docket Entry No. 28 at ¶¶ 78, 82, 86, 90, 94, 98, 102, 106, 110, 114, 118, 122, 126). The amended complaint alleged that these omissions materially misled investors by obscuring "the depth of the paid-promotions scheme" and the extent to which Uranium Energy

funneled money to companies owned by Adnani and his family members to advertise Uranium Energy stock.  (Docket Entry No. 28 at ¶¶ 6, 29).  The amended complaint alleged that the following SEC filings were materially misleading: the April 2013, March 2014, June 2014, December 2014, March 2015, and June 2015 Forms 10-Q, (*id.* at ¶¶ 77, 87, 93, 97, 113, 121, 125); the 2013 and 2014 Forms 10-K, (*id.* at ¶¶ 81, 109); the November 2013 and September 2014 Forms S-3, (*id.* at ¶¶ 85, 101); the September 2014 Form 424B3, (*id.* at ¶ 105); and the January 2015 Form S-8, (*id.* at ¶ 117).

Although the specific value of the related-party transactions changed, the Item 404 disclosures were similar over the class period.  For example, the April 2013 Form 10-Q Item 404 disclosure stated:

> During the three and nine months ended April 30, 2013, the Company had transactions with certain officers and directors of the Company as follows:
>
> Incurred $42,409 and $126,323 (three and nine months ended April 30, 2012: $39,455 and $90,315) in general and administrative costs paid to a company controlled by a direct family member of a current officer; and
>
> Incurred $9,000 and $27,000 (three and nine months ended April 30, 2012: $Nil) in consulting fees paid to a company controlled by a current director of the Company.

(*Id.* at ¶ 77).  The amended complaint did not allege that the stock price changed as a result of these disclosures.  Although the amended complaint alleged that the disclosures contained material omissions, it did not allege that these omissions were revealed to the market or identify specific communications correcting and disclosing the omissions.

## C.    The Alleged Corrective Disclosures

The amended complaint alleged that on June 18, 2015, TheStreetSweeper.org published an article stating that "Uranium Energy was using undisclosed, paid stock promotions to increase the value of Uranium Energy shares."  (*Id.* at ¶ 127).  The article, which Stephens attached to her

amended complaint, discussed Uranium Energy's low stock price, attributing it to low uranium prices, low production, and bad earnings.  The article also stated that "[Uranium Energy] has been running up on promotions coming from Twitter, Seeking Alpha authors and reportedly hype paid by the company itself."  (Docket Entry No. 28, Ex. 26 at p. 5).

The amended complaint alleged that the article caused Uranium Energy's stock price to fall approximately 6.9 percent "on unusually heavy volume" that same day.  (Docket Entry No. 28 at ¶ 130).  On June 19, 2015, Uranium Energy issued a press release responding to the article's allegations.  The press release denied the truth or validity of TheStreetSweeper.org article as "unfounded allegations of a third party" with "questionable" motives.  (*Id.* at ¶ 131).  According to the press release, the report had "no merit."  (*Id.*).  The amended complaint alleged that the press release caused Uranium Energy's stock price to fall approximately 25.6 percent "on unusually heavy volume" that same day.  (*Id.* at ¶ 132).

The amended complaint alleged that a similar, more detailed, critical report about Uranium Energy had appeared in 2013.  On February 1, 2013, hotStocked.com cited a "Shazam Stocks" article claiming that Uranium Energy had run "a paid advertising campaign" and that the company had "practically initiated promotional coverage of its own stock."  (*Id.* at ¶ 44).  According to the article, the goal was to "ramp up" the Uranium Energy stock price.  (*Id.*).  The article alleged that the stock-price increase would be only "temporary."  (*Id.*).

The allegations in the amended complaint are analyzed under the applicable legal standards and the documents and information properly considered at this stage of the case.

## II.    The Legal Standards

### A.      Rule 12(b)(6) Motions to Dismiss

A pleading is deficient and may be dismissed under Rule 12(b)(6) if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'" *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555). "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Id.* (quoting *Twombly*, 550 U.S. at 558).

When a plaintiff's complaint fails to state a claim, the court should generally allow the plaintiff to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that doing so would be futile. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). However, a plaintiff should be denied leave to amend a complaint if

the court determines that the "proposed amendment clearly is frivolous, advancing a claim or defense that is legally insufficient on its face."  6 WRIGHT & MILLER § 1487; *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))).

In considering a Rule 12(b)(6) motion to dismiss, a court limits itself to the contents of the pleadings, with an exception.  In *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000), the Fifth Circuit approved the district court's consideration of documents the defendant attached to a motion to dismiss. The Fifth Circuit made it clear that "such consideration is limited to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins*, 224 F.3d at 498–99). Other courts approve the same practice.  *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." (citations omitted)); *see also Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1988) (citation omitted); *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

Stephens attached to the amended complaint articles about the uranium industry, blog posts about Uranium Energy, and the advertisements it used to promote its stock.  (Docket Entry No. 28, Exs. 1–26).  She also submitted copies of Uranium Energy's SEC filings.  (Docket Entry No. 38, Exs. A–J).  The defendants attached to their briefs several additional Uranium Energy SEC filings, a chart showing Uranium Energy's historic stock-price information, and a chart matching each

advertisement with its disclosure.  (Docket Entry No. 31, Exs. 2, 5–6).  The case law permits, and the plaintiffs do not object to, the court considering these documents in deciding the motion to dismiss.  *Collins*, 224 F.3d at 498–99; *In re Sec. Litig. BMC Software*, 183 F. Supp. 2d 860, 884 (S.D. Tex. 2001) (chart "included only for the court's convenience as a summary of information included in SEC filings" can be considered on a motion to dismiss (citing FED. R. EVID. 1006)).

### B.      The Pleading Requirements

#### 1.      Rule 8

Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  A complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 555.  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).

#### 2.      Rule 9(b)

Rule 9(b) requires a complaint to "state with particularity the circumstances constituting the fraud."  FED. R. CIV. P. 9(b).  "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out."  *Benchmark Elecs., Inc. v. J.M Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) ("In cases concerning

fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." (quotation marks omitted)).  The Fifth Circuit applies "Rule 9(b) to fraud complaints with 'bite' and 'without apology,'" while recognizing "that Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading."  *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185–86 (5th Cir. 2009) (footnote omitted).

"Rule 9(b) does not reflect a subscription to fact pleading and requires only simple, concise, and direct allegations of the circumstances constituting fraud, which after *Twombly* must make relief plausible, not merely conceivable, when taken as true."  *Id.* at 186 (footnote omitted) (quotation marks omitted).  "Securities fraud claims brought by private litigants are also subject to the pleading requirements imposed by the [PSLRA]."  *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015).

## III.  Analysis

### A.  The Elements Required Under Section 10(b) and the PSLRA

"Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014).  "Although section 10(b) does not create an express private cause of action, [the Supreme Court has] long recognized an implied private cause of action to enforce the provision and its implementing regulation."  *Id.*  The implementing regulation reads:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a)     To employ any device, scheme, or artifice to defraud,

18

      (b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

      (c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Stephens sues all the defendants under all three subdivisions.  "The elements of a private securities fraud claim based on Section 10(b) and Rule 10b-5 are (1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation, (5) economic loss, and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss."  *Owens*, 789 F.3d at 535 (quotation marks omitted).

The defendants moved to dismiss for three reasons: they had no duty to make the alleged omissions and the omissions were not materially misleading; the amended complaint does not give rise to a strong inference of scienter; and the amended complaint does not plausibly allege loss causation.  Each is considered below.

### 1.      Fraud by Omission

A complaint alleging a material misstatement or omission must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  "At

a minimum, the PSLRA pleading standard incorporates the . . . requirements of Rule 9(b)." *Owens*, 789 F.3d at 535; *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) ("The PSLRA appears to comport with [the Fifth Circuit's] relatively strict interpretation of Rule 9(b), which requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." (quotation marks omitted)); *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012) ("[A] plaintiff must . . . (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent." (citing *ABC Arbitrage Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

Fraud based on an omission must sufficiently allege "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quotation marks omitted). But "[s]ome information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." *TCS Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976). "[I]f the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information a result that is hardly conducive to informed decisionmaking." *Id.* at 448–49. To

balance these concerns, "the plaintiff must plead not only why the statement at issue is incomplete but why that incompleteness makes the statement misleading or untrue." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005). "[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5).

While these cases make clear that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5," *Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988), "[t]he omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action," *Lormand*, 565 F3d. at 248.  The Fifth Circuit has

> long held under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.  Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction.

*Id.*

### 2.    Scienter

Under the PSLRA, plaintiffs must state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter.  15 U.S.C. § 78u-4(b)(2)(A).  For "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  Scienter requires "an intent to deceive, manipulate or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious

that the defendant must have been aware of it." *Phillips*, 401 F.3d at 643 (quotation marks omitted). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.* (quotation marks omitted).

In *Tellabs, Inc. v. Makor Issues & Rights Ltd.* ("*Tellabs I*"), 551 U.S. 308 (2007), the Supreme Court described how to analyze the sufficiency of scienter allegations on a motion to dismiss a federal securities-fraud case under the PSLRA.[3]  *Id.* at 322–23.  First, the district court must determine the factually sufficient complaint allegations and take them as true.  *Id.* at 322. Second, the court considers documents incorporated in the complaint by reference and matters subject to judicial notice.  *Id.* at 322–23.  Third, the court must take into account plausible inferences opposing as well as supporting an inference of scienter.  *Id.* at 323.  The factual allegations must be evaluated collectively, not in isolation, to determine whether they plead a strong inference of scienter.  *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter, each allegation of fraud must individually meet the particularity requirements of the PSLRA." (citation omitted)).  "A district court may best make sense of scienter allegations by first looking to the contribution of each individual allegation to a strong inference of scienter, especially in a complicated case . . . ."  *Owens*, 789 F.3d at 537.  "As a matter of efficiency, if any single allegation, standing alone, create[s] a strong inference of scienter, the court [does] not need to consider additional allegations of scienter."  *Id.*  If analyzing each allegation alone does not support

---

[3] The Supreme Court did not decide whether recklessness suffices for civil liability under §10(b) and Rule 10b-5 because the question was not presented in that case.  The Court noted that the courts of appeals all permit §10(b) claims based on reckless behavior but define "recklessness" differently.  *Tellabs I*, 551 U.S. at 319 n.1.

a strong inference of scienter, "the court must follow this initial step with a holistic look at all the scienter allegations," or may assess the allegations holistically, without first engaging in an allegation-by-allegation analysis. *Id.*

The scienter inference need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs I*, 551 U.S. at 324 (quotation marks omitted). But it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "The strength of an inference cannot be decided in a vacuum." *Id.* at 323. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u-4(b)(2)). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts allege." *Id.* at 324. "[A] tie favors the plaintiff." *Lormand*, 565 F.3d at 254.

Courts in this circuit look to the state of mind of the individual corporate official who allegedly made, approved, or issued the statement at issue, or who furnished information or language to include in the statement. It is insufficient to impute to each defendant a kind of collective knowledge that all the corporation's officers and employees acquired in their employment. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009). The allegations claimed to show scienter on each defendant's part must be analyzed individually to

determine whether the complaint sufficiently pleads scienter as to that defendant.  *Id.*; *see also Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532–33 (5th Cir. 2008) ("[T]his court has rejected the group pleading approach to scienter. . . . Consequently, it is only necessary for us to address the allegations claimed to adequately show scienter on the part of the named officers to determine whether the complaint sufficiently pleads scienter." (quotation marks omitted)).

The rejection of group pleading requires plaintiffs pleading fraud claims against individuals under § 10(b) and Rule 10b-5 to distinguish among the defendants and allege each one's role, intent, and knowledge.  *Southland*, 365 F.3d at 365 (courts may not "construe allegations contained in the Complaint against the defendants as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").   "A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement."  *Id.* at 366.  Courts must "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the court of their employment."  *Id.*  Under the securities laws, as under the common law, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual . . . ."  *Id.*

In *Local 731 I.B. v. Diodes, Inc.*, 810 F.3d 951 (5th Cir. 2016), the Fifth Circuit affirmed the

dismissal of a § 10(b) putative class action, stressing the importance of pleading a strong inference of scienter.  "[A]llegations of motive and opportunity standing alone will not suffice, though such circumstantial evidence can enhance the strength of the inference of scienter."  *Id.* at 957 (quotation marks omitted).  Without more, "an officer's position with a company does not suffice to create an inference of scienter."  *Id.* at 958 (quotation marks omitted).  An officer's company position can support a scienter inference only when viewed with other, "special circumstances," including: (1) a small company in which corporate executives are likely to be familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) internally inconsistent statements by the officer.  *Id*. at 959.

### 3.  Loss Causation

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (quotation marks omitted).  The PSLRA "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  "To establish proximate causation, the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm."  *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014).

The complaint must plausibly allege that the defendant's share price fell "after the truth

became known"; alleging "purchase price inflation alone [is not] sufficient." *Dura*, 544 U.S. at 347.

"Loss causation in fraud-on-the-market cases can be demonstrated circumstantially by (1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of price drop." *Amedisys*, 769 F.3d at 320–21 (quotation marks omitted).

A corrective disclosure must "relate to" or "be relevant to" "the defendants' fraud and earlier misstatements." *Id.* at 321. But a corrective disclosure need not "precisely mirror" the alleged misrepresentations. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (quotation marks omitted). "If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements." *Id.*

"The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Amedisys*, 769 F.3d at 321. A corrective disclosure can come from any source and "can be gradually perceived in the marketplace through a series of partial disclosures." *Id.* at 322. Sources may include "whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc." *Id.* (quotation marks omitted). When a complaint alleges a series of partial disclosures, the court may analyze each in isolation but must "consider them collectively in

26

determining whether a corrective disclosure has occurred." *Id.*

**B.**     **The Claims Under Rule 10b-5(b): Omissions in the SEC Disclosures**

Stephens alleged that Uranium Energy's SEC filings contained materially misleading omissions about the company's stock-price volatility and related-party transactions, violating 17 C.F.R. § 240.10b-5(b).

**1.**     **The Claims Based on Omitting the Risks of the Stock-Price Volatility**

**a.**     **The Arguments About Materiality and the Duty to Disclose**

Although the defendants argue that they had no duty to disclose the advertising campaign and that the omissions in the SEC filings cannot be material as a result, the amended complaint does not allege that the failure to disclose the advertising campaign was materially misleading under Rule 10b-5(b).  Rather, Stephens argues that the defendants misled investors by disclosing some Uranium Energy stock risks without disclosing the stock-price-volatility risks caused by the advertising campaign.  Stephens alleges "a substantial likelihood that the disclosure of the [promotional campaign as an investment risk] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *See Matrixx*, 563 U.S. at 38 (quotation marks omitted).  These alleged omissions generally consist of information showing the effect of the advertising campaign on the stock price.  (Docket Entry No. 28 at ¶ 41).

The defendants respond that the market knew the material information about the promotional campaign because each newsletter, alert, or article stated that it was a paid advertisement and that a reasonable investor could use publicly available information to see the relationship between the advertisements and the stock price.  Stephens contends that although each advertisement included disclaimers, none revealed to the market the promotional campaign's size, scale, ties to Uranium

Energy, or effect on the company's stock price. Stephens argues that the defendants' "truth-on-the-market" defense cannot appropriately be considered at the motion-to-dismiss stage.

Even assuming, without deciding, that the omissions were material, the claims still fail because the amended complaint neither pleads facts giving rise to a strong inference of scienter nor plausibly alleges loss causation.

### b.    Scienter

For "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  "[T]he PSLRA requires the plaintiffs to distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365 (quotation marks omitted).  The Fifth Circuit repeatedly has "rejected the group pleading doctrine."  *Owens*, 789 F.3d at 537 (collecting cases).  "Consistent with [that] rejection," a court cannot "construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland*, 365 F.3d at 365.  The scienter allegations are analyzed separately for each defendant.

### i.    No Individual Liability of Adnani and Katsumata

Stephens alleges that Adnani and Katsumata signed SEC filings containing materially misleading omissions.  (Docket Entry No. 38, Ex. 1).  Corporate statements can be tied to directors and officers by allegations that the officer or director signed the document with the statement. *Southland*, 365 F.3d at 365.  But a signature without more does not establish scienter.  Rather, "[t]here must be . . . facts establishing that the officer who signed the certification had a reason to

know, or should have suspected, due to the presence of . . . 'red flags,' that the [disclosure] statements contained material misstatements or omissions."  *Shaw*, 537 F.3d at 545.

Stephens argues that the amended complaint's allegations raise a strong inference that the defendants "were aware of the paid promotional campaign" based on the cost, the company's small size, and the fact that the advertisements concerned a "core" aspect of the company's business—the value of its common stock.  (Docket Entry No. 38 at p. 23).  But the question is not whether Adnani and Katsumata knew about the promotional campaign.  Rather, "[t]he resulting question is whether any inference of scienter should be drawn from defendants' knowledge."  *Owens*, 789 F.3d at 539.

A company may advertise or promote its stock without violating the securities laws.  *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 83 (D. Mass. 2005).  Under § 17(b) of the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, however, it is unlawful "to publish, give publicity to, or circulate any . . . communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer . . . without fully disclosing the receipt . . . of such consideration and the amount thereof."  15 U.S.C. § 77q(b).  Section 17(b) places "the burden to disclose . . . on the person who publishes the analyst's report; by contrast, there is no duty imposed by the statute on the issuer who has paid for the puffery."  *Id.*; *see also United States v. Wenger*, 427 F.3d 840, 850 (10th Cir. 2005)  ("[T]he *promoter* must provide a disclaimer as to each security he touts at the time he promotes the security." (emphasis added)); HAZEN, 5 TREATISE ON THE LAW OF SECURITIES REGULATION § 14.148 (Section 17(b) "focuses on the person making the recommendation and thus does not expressly extend to the company or other person paying for the recommendation"; only "substantial involvement by the company or other person paying for the recommendation could result in their being accountable as

primary violators . . . [under] Rule 10b-5.").   Absent an affirmative duty to disclose the advertisements, Adnani's and Katsumata's general knowledge of the advertising campaign does not support an inference that they acted with scienter.

Nor does the defendants' knowledge of the promotions give rise to—much less strongly support—an inference that they knew about the specific omission alleged: the risk that the promotional campaign would increase Uranium Energy's stock-price volatility.   And even if it did, that knowledge does not support an inference that either Adnani or Katsumata acted purposefully or severely recklessly to defraud investors by failing to disclose this risk of the advertising campaign in the SEC filings.   The court must consider plausible, nonculpable explanations for the defendants' conduct, as well as inferences favoring the plaintiffs.   *Tellabs I*, 551 U.S. at 323.   A plausible, nonculpable explanation for the nondisclosure is that the defendants should have known—but did not in fact know—about the promotional scheme's boom-and-bust effect on the stock-price volatility.   Another plausible, nonculpable explanation for the nondisclosure is that the defendants failed to perceive that risk as material.   Negligence cannot support a scienter inference.   *Owens*, 789 F.3d at 536.   The answer to whether the scienter inference the plaintiffs seek to draw is "at least as compelling" as these opposing inferences is "no."   *Id.* (quoting *Tellabs I*, 551 U.S. at 324).

Stephens relies heavily on Adnani's and Katsumata's positions in the company for support. She contends that as the company's cofounder and CFO, Adnani and Katsumata must have known about the promotions and their effect on Uranium Energy's stock price, citing *Nathenson v. Zonagen*, 267 F.3d 400 (5th Cir. 2001).

*Nathenson* held that the individual defendants' positions within the defendant pharmaceutical company enhanced the scienter allegations.   The court also "recognize[d] that normally an officer's

position with a company does not suffice to create an inference of scienter." *Id.* at 424; *see also*
*Shaw*, 537 F.3d at 535 ("[Fifth Circuit] caselaw makes clear that pleading[s] of scienter may not rest
on the inference that defendants must have been aware of the misstatement based on their positions
with the company." (quotation marks omitted)).  The court noted "a number of special circumstances
. . . taken together, [that] suffice[d] to support a different result in the present case." *Nathenson*, 267
F.3d at 425.  The defendant company was small and had only three-dozen full-time employees; it
was essentially a one-product company; and the alleged misrepresentations were about the patent
protection for that single product, the company's most crucial issue.

The Fifth Circuit and other courts have been reluctant to apply the limited exception
recognized in *Nathenson*.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867–68 (5th Cir. 2003)
(rejecting the plaintiffs' argument that "the failure of Azurix's core business—water-privatization
projects—supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects
for success" and holding that the plaintiffs must "identify exactly who supplied the information or
when they knew the information"); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)
("A pleading of scienter may not rest on the inference that defendants must have been aware of the
misstatement based on their positions within the company.").[4]  Instead, only in the "rare" case will
a strong inference of scienter be drawn from an officer's position in a company, and only when this
factor combines with other, "special circumstances." *Diodes*, 810 F.3d at 959.  These circumstances

---

[4] *See also  Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 754 (S.D. Tex. 2003) ("Plaintiffs have
relied on the judicially created presumption that facts critical to a business's core operations or an important
transaction generally are so apparent that their knowledge may be attributed to the company and its key
officers. . . .  [T]he purpose of the PSLRA's particularized pleading requirements leads this Court to find that
such an imputation, without some additional facts such as exposure to content-identified internal corporate
documents (and who drafted them, who received them or how plaintiffs learned of them) or specific
conversations or attendance at specified management or board meetings dealing with such problems, is
inadequate to plead scienter." (citations omitted) (quotation marks omitted)).

may include: (1) a small company in which corporate executives are more likely to be familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. *Id*.

None of those circumstances are present here. Uranium Energy had 61 full-time employees, more than the companies falling under the *Nathenson* exception. Stephens does not allege that Adnani's or Katsumata's statements were internally inconsistent. There are no allegations that Katsumata, in his role as CFO, developed, oversaw, or managed the promotional campaign; his corporate position provides a weaker basis for inferring scienter as a result. Nor does the amended complaint allege facts supporting an inference that the information Katsumata failed to disclose was "readily apparent" to him.

As for Adnani, the amended complaint alleges that other companies he founded, including Brazil Resources, were used to advertise Uranium Energy's stock. That Adnani held a leadership role in both Uranium Energy and in the third-party-promoter companies Uranium Energy used to advertise its stock strengthens the inference that he knew about the promotional campaign. But the amended complaint does not allege facts linking Adnani's knowledge about the promotional campaign with the specific effect it allegedly had on the stock-price volatility. There are no allegations supporting an inference that this effect was "readily apparent" to him or that he was so involved in the advertising campaign that he must have known about its demonstrated, consistent effect on the stock price. Although Adnani was the CEO, and although the amended complaint supports an inference that he was aware of the promotional campaign, the plaintiffs have not alleged facts giving rise to a cogent and compelling inference that he was at least severely reckless in failing

to disclose the stock-price-volatility information.

Stephens argues that this case is "on all fours" with *In re CytRx Corp. Securities Litigation*, No. 14-1956-GHK, 2015 WL 5031232 (C.D. Cal. July 13, 2015). That case appears different in important ways. CytRx hired a marketing team and paid it to publish positive, allegedly misleading advertisements in the form of articles about the company. The corporate-officer defendants "edited and approved the articles before publication." *Id.* at *2. The articles did not disclose that they were paid advertisements, and they were written under aliases to conceal "the involvement of CytRx's management." *Id.* The *CytRx* plaintiffs supported the complaint allegations with a whistleblower report written by an advertiser who had worked with CytRx management. After the advertisements "artificially inflated shares of CytRx's common stock," the defendants "awarded themselves and members of CytRx's Board of Directors . . . with massive amounts of *perfectly*-timed stock option grants." *Id.* (quotation marks omitted).

Here, by contrast, Stephens does not allege—with one exception, addressed below—that the promotions failed to reveal that they were paid advertisements or otherwise contained misleading information about Uranium Energy. Unlike the *CytRx* promotions, the articles, alerts, and newsletters at issue disclosed that they were paid advertisements. Stephens's focus in alleging misleading omissions is on Uranium Energy's SEC filings, not the promotions. Nor does Stephens allege that the individual defendants reviewed, edited, or approved the promotions, or claim that they awarded themselves "perfectly timed" or other stock-option grants designed to reap the profits from the advertising campaign. Indeed, the amended complaint does not rely on insider-trading

33

allegations.[5]  In other words, this amended complaint alleges a "pump" scheme without any "dump."

The *CytRx* court relied on those types of allegations to find a strong scienter inference as to the

individual defendants.  *See id.* at *10–11 (complaint allegations raised strong scienter inference as

to CEO who sold his shares in another company that was "allegedly involved in the exact same type

of [promotional] scheme" and did so "soon before" the scheme became public); *id.* (CEO received

925,000 "spring-loaded stock options" one day before the company issued a press release touting

the "statistically significant positive results" of a clinical trial that was "the most important news in

[company] history," even though the company also stated that it had not "timed the release of

material nonpublic information for the purpose of affecting the value of stock options"); *id.* at *11

(complaint allegations raised strong scienter inference as to CFO who received 150,000 stock

options the day before announcing the clinical-trial results and who, in his role as CFO, "surely must

[have] been aware" of the stock-option grants, which were "the largest director grants ever made to

CytRx insiders and nearly doubled the amount of compensation that each of the directors had

received in 2012").  The amended complaint, by contrast, alleges that the articles truthfully disclosed

that they were paid advertisements, did not themselves contain false or misleading statements, were

---

[5] Stephens does invoke the amended complaint allegation that a February 2013 online article reported that "Adnani had recently been busy selling shares and exercising corporate options and warrants" to benefit personally from the promotional campaign. (Docket Entry No. 28 at ¶ 44).  The article also "suggested" that "the ultimate aim of [the] promotional campaign was to 'ramp up' the price of Uranium Energy shares and, thus, 'potentially pave the way for further insider trading.'"  (*Id.*).  These allegations do not support a strong scienter inference because they antedate the class-period start of June 2013.  And even if pre-class-period allegations could support scienter during the class period, the amended complaint does not allege insider trading during the class period.  The amended complaint does not allege "sales [that] are out of line with prior trading practices" or that were made "in suspicious amounts or at suspicious times . . . calculated to maximize personal profit."  *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 435 (5th Cir. 2002).  A single, pre-class-period insider-trading allegation, without more, cannot give rise to a compelling and cogent inference of scienter during the class period.  *Cf. id.* ("[E]ven unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the [c]lass [p]eriod.").

written without the defendants' personal involvement or approval, and were circulated without the defendants profiting from suspicious stock sales or "perfectly timed" stock-option grants.

Stephens also cites *In re BP P.L.C. Securities Litigation*, 843 F. Supp. 2d 712 (S.D. Tex. 2012). That case is different as well. In *BP*, the CEO had promised to focus on the security of oil rigs "like a laser." *Id.* at 782. The court concluded that the CEO's "own actions as the spokesperson and champion for BP's reform efforts weigh[ed] strongly in favor of the inference that [the CEO] paid special attention to BP's process safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements." *Id.* at 783. Stephens does not allege that Adnani or Katsumata publicly or privately pledged to "champion" the advertising campaign. The complaint allegations support an inference that Adnani and Katsumata knew about that campaign but not that they were personally involved in writing, editing, or approving the advertisements. The primary similarity between the BP CEO and the two Uranium Energy executives here is their status as "chief" company officers. But a defendant's position in a company is not enough on its own to support a cogent and compelling scienter inference.

Stephens's group pleading further undermines her scienter arguments as to Adnani and Katsumata. Besides their different corporate roles and Adnani's involvement with Brazil Resources and Blender Media, the amended complaint fails to distinguish between their intent and knowledge, how or when each came to know about "red flags" that allegedly showed the effects of the promotional campaign on stock-price volatility, and how and when each decided to withhold that information from investors to defraud them. Instead, the amended complaint effectively imputes scienter to Adnani and Katsumata based on actions Uranium Energy took. That has it backwards. The complaint must cogently and compellingly support an inference that Adnani and

Katsumata—not the company—acted with at least severe recklessness. *See Southland*, 365 F.3d at 366 (the court must "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702, 707 (7th Cir. 2008) ("The problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily not a deliberate act, could be the result of a series of acts none of which was done with scienter and imputable to the company by the doctrine of respondeat superior.").

Stephens's final argument is that a press release issued after the alleged corrective disclosure on TheStreetSweeper.org website shows that the defendants "were keenly focused on publicity about [Uranium Energy] that appeared on the internet" and that "the only reasonable inference is that [the defendants] tracked the existence of such a massive, paid promotional scheme campaign" and were "reckless in disregarding internet traffic regarding [Uranium Energy] while at the same time failing to disclose the stock price volatility risks associated with such a campaign." (Docket Entry No. 38 at p. 22). The press release does not support this chain of inferences. The press release stated that Uranium Energy had reviewed the article on TheStreetSweeper.org and its statement that Uranium Energy used paid promoters. (Docket Entry No. 38, Ex. 11). The press release stated that the article's allegations had "absolutely no merit" and were "unfounded." The press release does not generate or support an inference that Adnani or Katsumata "tracked" or "followed" internet traffic before the press release or that internet traffic put them on notice of stock-price-volatility risks. This

argument is too conclusory and speculative to provide the necessary support for a scienter inference.

Taking "collectively" the facts alleged, accounting for "plausible opposing inferences," and weighing the strength of the scienter inferences against the nonculpable inferences the factual allegations support, together lead to the conclusion that Stephens has not alleged the strong scienter inference the PSLRA requires. *Tellabs I*, 551 U.S. at 323–24. At most, the amended complaint supports an inference that Adnani and Katsumata acted negligently in failing to disclose the risk that the advertising campaign would make Uranium Energy's stock price more volatile. The allegations provide inadequate support for a plausible—much less strong—inference that Adnani and Katsumata were severely reckless in disregarding known or obvious facts about the advertising campaign when they made the statements challenged for what they omitted. There is instead a strong, plausible, nonculpable inference that in this alleged "pump-without-a-dump" scheme, Adnani and Katsumata knew about the advertisements but not about their full effects on stock-price volatility and without a severely reckless or deliberate intent to conceal that risk.

To survive dismissal under the PSLRA, the scienter inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." *Id.* at 325. The amended complaint, taken as a whole, does not give rise to a cogent and compelling inference that Adnani and Katsumata acted with intent to, or with severely reckless disregard for the likelihood of, misleading investors when they made the allegedly incomplete statements.

### ii.    No Corporate Liability of Uranium Energy

"While . . . a corporation may be charged with the collective knowledge of its employees, it does not follow that the corporation may be deemed to have a culpable state of mind when that state of mind is possessed by no single employee. A corporation can be held to have a particular

state of mind only when that state of mind is possessed by a single individual." *Southland*, 365 F.3d at 367 (quoting *First Equity Corp. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988)). As discussed, the amended complaint does not give rise to a strong scienter inference as to Adnani or Katsumata. Nor does the amended complaint assert that "any particular individual [Uranium Energy] director, officer or employee, *other than* the named individual defendants, acted with scienter in or respecting the making or issue of the complained of statements." *See id.* The amended complaint fails to give rise to a strong scienter inference as to Uranium Energy. *Id.* at 366 ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement . . . ." (quotation marks omitted)).

In *Tellabs II*, the Seventh Circuit noted that a plaintiff may be able "to draw a strong inference of corporate scienter without being able to name the individuals who concocted the fraud." 513 F.3d at 710. The court offered the hypothetical example of General Motors announcing that it had sold one million SUVs in a year when it had not sold any. In a lawsuit based on this announcement, even if the plaintiff could not name an individual officer responsible for the statement, "[t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.*

Although the Fifth Circuit has not issued an opinion discussing the Seventh Circuit's approach, at least two district courts in this circuit have found the circumstances for inferring corporate scienter to be limited. In *In re Dell Securities Litigation*, 591 F. Supp. 2d 877 (W.D. Tex.

2008), the court concluded that the facts alleged could not support an inference of corporate scienter to replace a showing of individual scienter.  The court explained that the alleged misrepresentations were not "dramatic enough to assume corporate officials who were knowledgeable about the company generally would have known of their falsity at the time they were made."  *Id.* at 899.  In *In re B.P. P.L.C. Securities Litigation*, 843 F. Supp. 2d 712 (S.D. Tex. 2012), by contrast, the court found that the complaint gave rise to an inference of corporate scienter.  After the Deepwater Horizon oil spill, BP had estimated that it could recover about 500,000 barrels of oil per day.  Just over a month after the spill, BP and its contractors were recovering about 15,000 barrels per day. The court found that "the erroneous estimates climb very close to—if not exceed—the extraordinary nature of the facts envisioned by the Seventh Circuit."  *Id.* at 790.

In this case, Stephens has not alleged misleading statements by omissions made so clearly and obviously as to support an inference that the individual officers knowledgeable about the company generally also knew that the omissions were materially misleading.  There is no basis to find that the alleged omissions meet the "extraordinary nature" of those envisioned in *Tellabs II*. To the extent Stephens relies on a corporate-scienter theory, the complaint allegations provide no support.

### c. The Third-Party Promoters Did not "Make" Statements with Materially Misleading Omissions

To the extent the amended complaint asserts claims against the third-party promoters under Rule 10b-5(b), those claims fail as a matter of law.  In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), the Supreme Court considered what it means to "make" a statement under Rule 10b-5(b).  "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to

communicate it." *Id.* at 142.  The misrepresentations Stephens alleged were in SEC reports Uranium Energy wrote and issued.  The amended complaint does not allege that the third-party promoters played a role in authoring, editing, or approving Uranium Energy's SEC filings, much less that they had "the ultimate authority" over the content or method of communication.  Adnani and Katsumata were the only defendants who allegedly signed the SEC filings.  "And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  *Id.* at 142–43.

*Janus* clearly precludes the relief sought against the third-party promoters under Rule 10b-5(b).

### d.     No Loss Causation

Stephens alleged that the "relevant truth" obscured by the fraudulent omissions came to light on June 18, 2015 when TheStreetSweeper.org published an article claiming that Uranium Energy used undisclosed, paid stock promotions to increase the value of its shares.  (Docket Entry No. 28 at ¶ 7).  The article reported that "[Uranium Energy] has been running up on promotions coming from Twitter, Seeking Alpha authors and reportedly hype paid by the company itself."  (Docket Entry No. 28, Ex. 26).  Stephens argues that once this information became known, Uranium Energy's stock price fell as a result.  The question is whether the online article revealed information to the market that made "the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true."  *Amedisys*, 769 F.3d at 321.  The alleged fraud is omitting the advertisements' effect on Uranium Energy's stock-price volatility.

The amended complaint does not allege, nor does the article show, that TheStreetSweeper.org revealed information to the market that made the advertising campaign's role

in increasing Uranium Energy's stock-price volatility more likely.  The article merely stated that Uranium Energy paid third parties to advertise its stock.  The market already knew that.  All of the advertisements, save one, had a disclosure that the authors and issuers were paid in exchange for positive publicity about the company.

The amended complaint alleged that Uranium Energy's use of third-party promoters was first revealed to the market in February 2013, several months before the class period began.  The amended complaint alleged that on February 1, 2013, hotStocked.com cited a "Shazam Stocks" article claiming that Uranium Energy had run "a paid advertising campaign" and that the company had "practically initiated promotional coverage of its own stock."  (*Id.* at ¶ 44).  According to the article, the goal was to "ramp up" the Uranium Energy stock price.  (*Id.*).  The article alleged that the stock-price increase would be only "temporary."  (*Id.*).

A complaint does not plausibly allege loss causation when the disclosed information has already been revealed to the market.  Confirmatory information cannot cause a change in stock price, as a matter of law.  *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665–66 (5th Cir. 2004) ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.  Because the presumption of reliance is based upon actual movement of the stock price, confirmatory information cannot be the basis for a fraud-on-the-market claim.").

Stephens responds that the TheStreetSweeper.org article alerted investors "for the first time . . . to the size and scope of the promotional campaign" and "claimed that [Uranium Energy] had failed to disclose its paid promotional scheme."  (Docket Entry No. 38 at p. 28–29).  The article, however, stated that Uranium Energy had "been running up on promotions coming from Twitter, Seeking Alpha authors and reportedly hype paid by the company itself"; it did not provide the

sweeping picture or the more specific details Stephens describes in her argument.  And, as discussed, Uranium Energy had no independent duty to disclose its use of third-party promoters in the first place.  The relevant fraudulent omissions for purposes of the Rule 10b-5(b) claims focus on the effect the advertisements had on the stock-price volatility.  The TheStreetSweeper.org article was not the first "alert" to investors that the advertising campaign made Uranium Energy's stock price more volatile.

The amended complaint does not plausibly allege loss causation.[6]  This is an independent ground supporting dismissal of the Rule 10b-5(b) claims against all defendants.

### 2.    The Claims Based on Omitting Related-Party-Transaction Information

#### a.    No Materiality

Stephens argues that the defendants materially misled investors by omitting in the Item 404 disclosures "the name of the related person and the basis on which the person is a related person," "the related person's interest in the transaction with the registrant," and "the approximate dollar value of the amount involved in the transaction."  The defendants respond that these omissions were immaterial.  The amended complaint alleges that the Item 404 disclosures stated the value of each related-party transaction and identified which payments were made "to a company controlled by a

---

[6] The defendants argue that the amended complaint does not plausibly allege loss causation for an additional reason: relying on historical stock-price data that they submitted with their motion to dismiss, the defendants reason that "the paid promotions had no material immediate impact on the stock price, which actually declined in the days immediately after" some of the advertisements.  (Docket Entry No. 31 at p. 29). The court's brief review of the data provides an inadequate basis to conclude that Stephens has mischaracterized it.  No greater examination is appropriate at this stage.  The case law makes clear that this type of argument is not properly considered at the motion-to-dismiss stage, because "[t]he market could plausibly have had a delayed reaction; a delayed reaction can still satisfy the pleading requirements for 'loss causation' though proof of causation would be more difficult when significant time elapses before the market allegedly reacts."  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 266 n.33 (5th Cir. 2009).  "The actual timing issue is a factual question, and is not enough to dismiss a complaint that alleges a specific causal link, as is the case here, under Rule 12(b)(6)."  *Id.*

direct family member of a current officer." (Docket Entry No. 28 at ¶¶ 77, 81, 85, 89, 93, 97, 101, 105, 109, 113, 117, 121, 125). These allegations show that although the defendants did not disclose "the name of the related person and the basis on which the person is a related person," the defendants did disclose the interest in and the dollar value of each transaction.

Item 404 does not create an implied cause of action. "The case law is clear as to the absence of an express private right of action under Regulation S-K, and courts may not imply a private right of action under Regulation S-K where Congress has not established one." *Golan v. Puleo*, 480 F. Supp. 2d 1325, 1328 (S.D. Fla. 2007); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 37 (S.D.N.Y. 2004). But "if a plaintiff can establish all of the elements of a Rule 10b-5 claim such as scienter and reliance, a Regulation S-K violation may be relevant in establishing such a claim." HAZEN, 2 TREATISE ON THE LAW OF SECURITIES REGULATION § 9.56 n.13.

Stephens has not shown or explained how disclosing the name and relationship of family members involved in related-party transactions would have given rise to "a substantial likelihood that the disclosure . . . would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38 (quotation marks omitted).[7] She argues that had the defendants disclosed the family member names, this "would have called into question the value of [the plaintiffs'] investments in [Uranium Energy's] stock" and that by failing to comply with Item 404, the defendants "prevented investors from learning that [Uranium Energy's] related-party transactions supported a longstanding stock promotion campaign that artificially inflated [the] stock price." (Docket Entry No. 38 at p. 18). This argument is too

---

[7] The SEC has made clear that Item 404 requires disclosure only when it would be "material," as the Supreme Court has articulated that standard since *Basic v. Levinson*, 485 U.S. 224 (1988). *See* Executive Compensation and Related Person Disclosure, 71 Fed. Reg. 53,158, 53,198 & n.413 (Sept. 8, 2006) (codified at 17 C.F.R. §§ 228, 229, 232, 239, 240, 245, 249, and 274).

conclusory and speculative to support an inference of materiality.

The alleged omissions from the Item 404 disclosures were not material and cannot support a Rule 10b-5(b) claims against any of the defendants.

### b.      No Loss Causation

Even if the Item 404 omissions were material, there is no accompanying corrective-disclosure allegation.  The amended complaint does not allege that the truth about the names of the individuals engaged in the related-party transactions was revealed or that this corrective disclosure preceded the stock-price drop.  Because the amended complaint failed to identify the "release of information that reveal[ed] to the market the pertinent truth that was previously concealed or obscured by the . . . fraud" and that caused a price drop, no Rule 10b-5(b) claim is stated.  *See Amedisys*, 769 F.3d at 320–21; *see also Dura*, 544 U.S. at 347 ("The complaint's failure to claim that [the defendant's] share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient," even though "the 'artificially inflated purchase price' is not itself a relevant economic loss.").  This is an independent ground supporting dismissal of the Rule 10b-5(b) claims against the defendants based on the Item 404 omissions.

### C.      The Claims Under Rule 10b-5(a) and Rule 10b-5(c): Omissions in or About the Third-Party Promotions

Stephens alleged that Uranium Energy's advertising campaign was a "scheme to defraud" and a "course of business" that "operated as a fraud," violating 17 C.F.R. § 240.10b-5(a) and (c).

### 1.      The Legal Standard

Claims under Rules 10b-5(a) and (c) invoke what some courts call "scheme liability."  *E.g.*,

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159 (2008). While Rule 10b-5(b)

imposes liability for deceptive statements, Rules 10b-5(a) and (c) impose liability for deceptive

conduct. *In re DIV, Inc. Sec. Litig.*, 639 F.3d 623, 643 n.29 (3d Cir. 2011), *abrogated on other*

*grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013). Although the

Fifth Circuit has not addressed the issue, at least three courts of appeals have held that the "scheme"

must "encompass[] conduct beyond those misrepresentations or omissions" allegedly giving rise to

Rule 10b-5(b) liability. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039,

1057 (9th Cir. 2011); *see also Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th

Cir. 2012) ("[S]cheme liability claim must be based on conduct beyond misrepresentations or

omissions actionable under Rule 10b–5(b)."); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d

Cir. 2005).

The scope of scheme liability is unclear. The Supreme Court has held that "a private plaintiff

may not maintain an aiding and abetting suit under § 10(b)." *Cent. Bank of Denver, N.A. v. First*

*Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). To hold otherwise would "impose . . .

liability when at least one element critical for recovery under 10b-5 is absent: reliance." *Id.* at 180.

But that "does not mean that secondary actors in the securities markets are always free from liability

under the securities Acts." *Id.* at 191. The Court explained that:

> [a]ny person or entity, including a lawyer, accountant, or bank, who employs a
> manipulative device or makes a material misstatement (or omission) on which a
> purchaser or seller of securities relies may be liable as a primary violator under 10b-
> 5, assuming all of the requirements for primary liability under Rule 10b-5 are met.

*Id.*; *see also Stoneridge*, 522 U.S. at 166 ("[T]he implied right of action in § 10(b) continues to cover

secondary actors who commit primary violations."). The Fifth Circuit has held that "any defendant

who does not make or affirmatively cause to be made a fraudulent statement or omission, or who

45

does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 388 (5th Cir. 2007) (quoting *In re Charter Commc'ns, Inc., Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006)).

The question is whether the amended complaint alleges a "scheme" or "course of business" actionable under Rules 10b-5(a) and (c).

### 2.      Analysis

Stephens alleged that the defendants engaged in a scheme to conceal Uranium Energy's involvement in paying for the third-party promotions. The defendants allegedly "engaged in a concerted effort . . . to conceal the true source of the[] promotional materials and to persuade the investing public that information being presented was coming from parties not affiliated with Uranium Energy." (Docket Entry No. 28 at ¶ 46). "Although these materials purported to provide investors with detailed 'disclaimers' alongside the investing guidance and updates, in fact they gave readers little or no notice that the information came, directly or indirectly, from Uranium Energy." (*Id.*). By paying "for promotions through third parties," the defendants, the amended complaint alleges, intentionally "preclud[ed] even those investors who actually read the lengthy, fine-print disclosures" from "understanding the source of the payment the promoter received." (*Id.* at ¶ 26).

Stephens concedes that none of the articles, newsletters, or alerts themselves contained false or misleading statements and that all, except one, came with disclaimers that the materials were paid advertisements and not objective investment advice. Some disclaimers disclosed that Uranium Energy had paid for the advertising materials directly. This category included the May 2014 alerts and the November 2014 FutureMoneyTrends.com newsletter. (*Id.* at ¶¶ 57, 65). Others disclosed

46

that the materials were paid advertisements but did not identify Uranium Energy as the source. Instead, these disclaimers identified a third party who Uranium Energy allegedly paid, without disclosing Uranium Energy as the source.  The June 2013 and the remaining November 2014 promotions are in this category.  (*Id.* at ¶¶ 53, 61, 63).  Because the amended complaint did not allege that the content of the advertisements was fraudulent, and because the disclaimers revealed that the promoters had been paid and how much, Stephens's scheme-liability allegations turn on the allegation that some, but not all, of the advertisement disclaimers revealed that Uranium Energy had directly or indirectly paid for the advertisements.

Stephens relies on four district court cases for support, but in each of those cases, the advertisements themselves were allegedly false or misleading.  *In re CytRx*, 2015 WL 5031232, at *2; *SEC v. Farmer*, No. 14-cv-2345, 2015 WL 5838867, at *15 (S.D. Tex. Oct. 7, 2015) (defendant "coordinated and funded" advertising campaign that "disseminated false information"); *SEC v. Strebinger*, 114 F. Supp. 3d 1321, 1325, 1331 (N.D. Ga. 2015) (defendant was "part of a scheme involving the contents of" reports containing "several materially false and otherwise misleading statements"); *JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735 (E.D. Mich. 2014).  Here, by contrast, Stephens does not contend that the advertisements misled investors.  She concedes that the advertisements conveyed truthful information to the market. (Docket Entry No. 46 at p. 21).  That makes the scheme here materially different from those involved in the cited cases.  Instead of showing how the advertisements misled investors, Stephens must allege facts showing that the failure to disclose the "true" or "ultimate" identity of the party paying for the advertisements and the connection to Uranium Energy states a claim under § 10(b). *See Bank of Denver*, 511 U.S. at 191 (scheme-liability allegations must meet "all of the requirements

for primary liability under Rule 10b-5.").

The amended complaint fails to allege that the defendants' "scheme" or "course of business" withheld material information from investors.  The court's reasoning in *Garvey v. Arkoosh*, 354 F. Supp. 2d 73 (D. Mass. 2005), is persuasive.  The *Garvey* plaintiffs, like Stephens, based Rule 10b-5(a) and (c) claims on a campaign to advertise a company's stock.  *Id.* at 76.  The plaintiffs argued that even though newsletters with positive information about the company disclosed that they were paid advertisements, the promotions were a fraudulent scheme because they failed to disclose that the individual corporate-officer defendants were the ones ultimately "using company funds to carry out a 'pump and dump' scheme."  *Id.* at 84.  The court held that the identity of the party paying for the advertisement was not material, provided that investors knew that the information in the "newsletter" or "article" was written by a party receiving financial compensation.  *Id.*  The court relied on the observation that "[a]ny reasonable investor told that the publisher of an investment report had received $700,000, $100,000, or even $50,000 to tout a particular stock would give the analyst's recommendation the proverbial grain [of] salt regardless of the source of the funds."  *Id.*

So too here.  Stephens has failed to show or explain how knowing that Uranium Energy paid for some of the advertisements—as opposed to, for example, Raven Consulting or Fin Media—would have "been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Matrixx*, 563 U.S. at 38.  And to the extent that she argues that failing to disclose Uranium Energy's involvement prevented investors from learning about the advertisements' effect on the stock's volatility, that omission is the same omission that forms the basis of the Rule 10b-5(b) claims and cannot, without more, give rise to liability under Rules 10b-5(a) and (c).  *See, e.g.*, *KV Pharm. Co.*, 679 F.3d at 987.

Stephens emphasizes that the April 2015 Stock Gumshoe article did not disclose the alleged payment by Uranium Energy.  (*Id.* at ¶ 70).  Even if this omission was material, and even if a single nondisclosure could constitute a "scheme" under Rules 10b-5(a) and (c), the amended complaint does not allege facts giving rise to a strong inference that any of the defendants knowingly or severely recklessly conspired to hide that information from investors.  Because there are no scienter allegations relating to the Stock Gumshoe article, the absence of this disclosure is not actionable.

The amended complaint does not state a claim for scheme liability against any of the defendants under Rules 10b-5(a) or (c).

### D.    The Claims Under Section 20

Section 20(a) of the Exchange Act imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud.  15 U.S.C. § 78t(a).  "Control person liability is secondary only and cannot exist in the absence of a primary violation."  *Southland*, 365 F.3d at 383. Because the amended complaint does not allege a primary violation, the Section 20 claims fail.

## IV.   Leave to Amend

Stephens filed her original complaint on June 29, 2015 and amended on November 16, 2015. (Docket Entry Nos. 1, 28).  In a footnote on the last page of her response to the motion to dismiss, she sought leave to amend the complaint and argued that it "should be granted unless there is a 'substantial reason' to deny the request."  (Docket Entry No. 38 at p. 31 n.38).  She has not "either tendered a further amended Complaint or advised the [] court of how or in what manner [she] would amend the Complaint or what allegations would be added or deleted if allowed to do so."  *See*

*Southland*, 365 F.3d at 384 (district court did not abuse its discretion in denying leave to amend).

Nor has she suggested that she has "relevant information [she was] unaware of when the Complaint

was filed (or that the defendants' motion to dismiss did not adequately inform [her] of the asserted

deficiencies in the Complaint)." *See id.* The pleading already has been amended once without

curing the deficiencies. The governing law makes further amendment futile.

The request for leave to amend is denied.

## V.      Conclusion

The defendants' motion to dismiss is granted. (Docket Entry No. 31). This action is

dismissed with prejudice. A final judgment is separately entered.

SIGNED on July 15, 2016, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

**Appendix: Sample Advertisements**

      A.      June 2013 (Docket Entry No. 28, Ex. 6)

# Newsletter

DETAILS

## Next Technical Leg Approaching for Uranium Energy Corp. (NYSE:...
## Jun 20, 2013 09:32

| Promoter: TooNiceStocks Paying Party: Fin Media | | |
|---|---|---|
| Stocks covered: | Compensation: | Avg $ Volume for Period: |
| UEC | $60000 | UNKNOWN |
| Max Profit: 0.95 % | Gain at close: -2.37 % | |



**STOP Important Disclaimer**

This page is a redisplay of an e-mail received that was most likely a paid promotional event. Hotstocked does not in any way agree or endorse the opinions expressed in the content of this e-mail nor have we verified the accuracy of any of the statements made. Hotstocked republishes this to serve as a reference for shareholders in the company.

Dear Valued Member,

Uranium Energy Corp. (NYSE-AMEX: UEC) is our New Big Technical Report

We continue to provide top-tier research to you as our reports are unmatched in the small-cap industry. We hit the nail right on the head with our last update to you that, "UEC yesterday dipped to a low of $2.05 and reversed back to $2.12 by the close. This type of support shows that technical eyes are looking for cheap shares to accumulate in our opinion. Remember these technical pull backs offer a huge opportunity to those who think they "missed the boat" as shares surged up for 16 straight market days in our opinion!"

UEC continues to look strong at the $2.00 support region in our opinion and the small-cap community seems to know that a next technical leg is approaching soon as accumulation seems strong in our opinion.

**Watch the video to learn about the probability of Uranium Energy Corp (UEC) Chart Signal as of Nov 16 2015**

UEC was featured in yet another research report and you can receive your on free copy by <clicking here>. A fascinating excerpt from the report stated that, "The uranium market has always had compelling fundamentals. In fact, the supply/demand argument for higher prices has been irrefutable for years — it's just the timing that has been in question.

But it's not like those powerful fundamentals haven't impacted the price before. In 2007, for example, the price briefly hit $140/pound, or more than triple today's levels. But then came the global financial crisis to toss the prices of all commodities into the dumpster.

Once we got past that train wreck and the global monetary reflation kicked in, the fundamentals for uranium began to kick in once more. The price of uranium was steadily climbing back up...when the Fukushima accident sent the price reeling once again." Make sure you head over to read the full report report now!

Remember we continue to initiate our coverage on UEC for weeks to come. You also have to remember UEC is a NYSE-AMEX listed company and just last year raised a massive financing at a much higher price to a institutional investor!

Keep UEC on top of your radar from here on out!

If you missed reading our original report on this impressive emerging growth company, please read full details by clicking here or read parts below. Click here to view research report

**Uranium Mining Projects in the US**
The Company has focused its property acquisition program primarily in the southwestern US states of Texas, Wyoming, New Mexico, Arizona, Colorado and Utah. This region has historically been the most concentrated area for uranium mining in the U.S. With the use of historical exploration databases, Uranium Energy Corp has been able to target properties for acquisition that have already been the subject of significant exploration and development by senior

energy companies in the past. Uranium Energy Corp's strategy of acquiring exploration databases and leveraging those databases to generate acquisition targets has been effective thus far. The Company will continue to aggressively pursue this formula on an ongoing basis. Uranium Energy Corp is well positioned to capitalize on the world's overwhelming demand for more uranium, for more energy, for cheaper energy and for a cleaner environment. Continue your research at www.uraniumenergy.com

Thanks,
www.TooNiceStocks.com
"Finding Value in the Undervalued"
We work hard to research promising companies in all exchanges. Read our independent research here! Please join us for DAILY CHATTER! QUESTIONS?? ASK US ON REAL RESEARCH FOR REAL TRADERS

Never invest in any stock featured on our site or newsletter unless you can afford to lose your entire investment. Please remember that this newsletter is intended for commercial advertising, business media marketing and is for informational purposes only. None of the profiles issued by TooNiceStocks.com constitutes a recommendation for any investor to purchase or sell any particular security or that any security is suitable for any investor as these are our opinions. Any investor should determine whether a particular security is suitable based on the investor's objectives, other securities holdings, financial situation needs, and tax status. The disclaimer is to be read and fully understood as a double opt-in subscriber as we do not tolerate spam. Please note well that TooNiceStocks.com employees are not Registered as an Investment Advisor in any jurisdiction whatsoever. Full disclaimer can be read

at www.toonicestocks.com. **Release of Liability:** Through use of this website viewing or using you agree to hold TooNiceStocks.com, its operators owners and employees harmless and to completely release them from any and all liability due to any and all loss (monetary or otherwise), damage (monetary or otherwise), or injury (monetary or otherwise) that you may incur. The information contained herein is based on sources which we believe to be reliable but is not guaranteed by us as being accurate and does not purport to be a complete statement or summary of the available data. The third party, may have shares and may liquidate it, which may negatively affect the stock price. TooNiceStocks.com encourages readers

and investors to supplement the information in these reports with independent research and other professional advice. All information on featured companies is provided by the companies profiled, or is available from public sources and TooNiceStocks.com makes no representations, warranties or guarantees as to the accuracy or completeness of the disclosure by the profiled companies. TooNiceStocks.com, nor any of its affiliates are not registered investment advisors or a broker dealers. None of the materials or advertisements herein constitute offers or solicitations to purchase or sell securities of the companies profiled herein and any decision to invest in any such company or other financial decisions should not be made based upon the information provide herein. Instead TooNiceStocks.com strongly urges you conduct a complete and independent investigation of the respective companies and consideration of all pertinent risks. TooNiceStocks.com does not offer such advice or analysis, and TooNiceStocks.com further urges you to consult your own independent tax, business, financial and investment advisors. Investing in micro-cap and growth securities is highly speculative and carries and extremely high degree of risk. It is possible that an investor's investment may be lost or impaired due to the speculative nature of the companies profiled. From time to time we are compensated for commercial advertising and business media marketing or providing our own independent research coverage and opinions, full disclosure can be found in accordance with section 17(b) of the Securities Act of 1933 at every publication. TooNiceStocks.com expects to be compensated up to sixty thousand dollars to provide one month of commercial/digital advertising and business brand media marketing by a third party Fin Media Networks. TooNiceStocks.com has been previously been compensated sixty thousand dollars to provide one week of commercial/digital advertising and business brand media marketing by a third party VentureCap Group. We own no shares. If we are ever compensated, this compensation constitutes a conflict of interest as to our ability to remain objective in our communication regarding the profiled company. Any statements that express or involve discussions with respect to predictions, expectations, beliefs, plans, projections, objectives, goals, assumptions or future events or performance are not statements of historical fact may be "forward looking statements". Forward looking statements are based on

expectations, estimates, and projections at the time the statements are made that involve a number of risks an uncertainties which could cause actual results or events to differ materially from those presently anticipated. Forward looking statements in this action may be identified through use of words such as "projects", "foresee", "expects", "will", "anticipates", "estimates", "believes", "understands", or that by statements indicating certain actions "may", "could", or "might" occur. Understand there is no guarantee past performance will be indicative of future results. TooNiceStocks.com may from time to time, trade securities mentioned on our profiles covered by our own independent research where we are not compensated for any coverage or compensated. Public disclosure, by any means, of future coverage, ratings changes, and/or changes in earnings estimates prior to publication is prohibited as we will always disclose fully. In preparing this publication, TooNiceStocks.com has relied upon information supplied by its customers, and press releases which it believes to be reliable; however, such reliability cannot be guaranteed. Investors should not rely on the information contained in this website. Rather, investors should use the information contained in this website as a starting point for doing additional independent research on the featured companies. The advertisements in this website are believed to be reliable, however, TooNiceStocks.com and its owners, affiliates, subsidiaries, officers, directors, representatives and agents disclaim any liability as to the completeness or accuracy of the information contained in any advertisement and for any omissions of materials facts from such advertisement. TooNiceStocks.com is not responsible for any claims made by the companies advertised here and are our own opinions.

**B.** **May 2014 (Docket Entry No. 28, Ex. 9)**



## New Pick: UEC !

**New Alert: (UEC) Is a <u>HOT</u> Stock !**

<u>NYSE:</u> **Uranium Energy Corp. (UEC)**
is flying up the charts, put it on your <u>RADAR!</u>

**May 7th (UEC) reached a**
**bottom at .94 and from there**
<u>UEC has soared to $1.61 on Break-Out</u>
**Volume.**

Multiple factors are driving **UEC** higher,
and tells me **UEC** is back in the drivers seat,
and so I'm putting it on immediate alert.

I have no crystal ball, nor can I guarantee that
there won't be further price and volume volatility,
but <u>I DO KNOW</u> that **UEC** is absolutely flying
up the charts. The shorts may be in major trouble
here!

**About Uranium Energy Corp.**

**UEC** is engaged in the exploration, extraction and processing
of uranium concentrates on projects in the United States
and Paraguay. *Learn More*

*Recent Interview On Bloomberg News. Watch Here*

**Bottom Line:** The Uranium Markets recent dip
**have not effected UEC of late.**

Don't Miss Out!



**More About UEC:**

**UEC** went from exploration to production
in less than 6 years. Navigating his own company
through Fukushima and attracting investors like
Rick Rule and Li Ka-shing (the Richest man in all of Asia).

**UEC** looks poised to be a contender as the Uranium
market rebounds!

**\*\*As always use our findings & conduct your own research.\***



**Trade Well,**

**Stock Professors**

DO NOT BASE ANY DECISION UPON ANY MATERIALS FOUND ON THIS REPORT OR WEBSITE unless you can afford to lose your entire investment. We are not registered as a securities broker-dealer or an investment adviser either with the U.S. Securities and Exchange Commission (the "SEC") or with any state securities regulatory authority. We are neither licensed nor qualified to provide investment advice. This is not an offer or solicitation to buy UEC. This is an informational service utilizing publicly available information and its recommended that further due diligence be conducted on any companies mentioned. StockProfessors.com is a wholly owned subsidiary of Raven Consulting Corp. Raven Consulting Corp. expects to be compensated $5,000.00 cash for this UEC advertising and promotion by Uranium Energy Corp (UEC) directly. All direct third party compensation received will be fully disclosed in any communication regarding a profiled company. This website is a service of Raven Consulting,, Corp, a financial public relations firm that has been compensated by the companies profiled. All direct and third party compensation received has been disclosed within each individual profile in accordance with section 17(b) of the Securities Act of 1 9 3 3. This compensation constitutes a conflict of interest as to our ability to remain objective in our communication regarding the profiled companies. Raven Consulting Corp, and/or its affiliated will hold, buy, and sell securities in the companies profiled. When compensated in shares, all readers should be aware that is our policy to liquidate all shares immediately. We reserve the right to buy or sell the shares of any the companies mentioned in any materi als we produce at any time. This compensation constitutes a conflict of interest as to our ability to remain objective in our communication regarding the profiled companies. The information contained in our report should be viewed as commercial advertisement and is not intended to be investment advice. The report is not provided to any particular individual with a view toward their individual circumstances. The information contained in our report is not an offer t o buy or sell securities. We distribute opinions, comments and information free of charge exclusively to individuals who wish to receive them. Our newsletter and website have been prepared for informational purposes only and are not intended to be used as a complete source of information on any particular company. An individual should never invest in the securities of any of the companies' profiled based solely on information contained in our report. Individuals should assume that all information contained in the report about profiled companies is not trustworthy unless verified by their own independent research. Full disclaimer can be read at stockprofessors.com

### C.    November 2014 (Docket Entry No. 28, Ex. 16)



High-Energy Trade To Start The Week

Greetings Trader!

If you wrote off the uranium stocks after the Japan disaster you might want to take a look at how **Uranium Energy Corp. (UEC)** is trading now.

Load that **UEC** chart and the power lighting up this play speaks for itself:



That big "vertical takeoff" arrow represents a **59.2% rally** since UEC hit what now looks like a near-term bottom of $1.08 on Tuesday.

I'm not seeing any public catalyst for that kind of big bull run so my guess is

that somebody saw a lot of value here or is simply riding the technicals.

Either way, a massive move like this twists all the indicators like the RSI and MACD, creating rally signals that alert traders to the fun **UEC** is having!

**More traders, more buzz, more rally? The team has seen similar "virtuous cycles" before, so let's unwrap what's making UEC tick.**

- Obviously **UEC** makes its money digging and selling uranium from its 7,000-acre mine in Texas when market conditions go its way. More recently they've been hoarding their ore and $8 million in cash.

- A quick scan of **UEC's** property portfolio reveals at least 30 MILLION pounds of uranium concentrate lurking in its dirt. Even here at a depressed $36 per pound, that's a cool $1 billion in future sales.

- Fun fact, uranium prices have already come back 30% since bottoming out last summer and as **UEC** points out, nuclear power still needs to burn 13 MILLION pounds a year beyond current supply! (Read more)

- Sooner or later, the stockpiles will be gone, Japan will OK new plants and uranium prices can spike back toward pre-Fukushima highs about double where they are now! Then **UEC** starts mining again!

**BOTTOM LINE:** Maybe that Japanese nuclear power plant starting up was the signal traders needed that the uranium play has come back to life.

The timing is a pretty close match to the huge upswing in both **UEC** share volume (10 times normal over the last 3 days) and obviously the PPS.

**Maybe somebody read between the lines and is now expecting UEC to put the mothballs away and start crunching ore again?**

All I really know is that this chart is rocking and so many short sellers were clinging to this ticker that those who haven't covered must be getting antsy!

This kind of breakout move usually goes one of two ways: either **UEC** keeps rallying, in which case the party hasn't shown any sign of stopping yet.

Or else **UEC** actually needs a rest, in which case that 60% gap on the chart should give you day traders plenty of "spread" to play around with!

One way or another, **UEC** is clearly in play -- so keep it in your sights today and see if you can dig a little of its glow for yourself!

Sincerely,

Michael Reef
yourstockguy@gmail.com

Disclaimer

This newsletter is a paid advertisement and is neither an offer nor recommendation to buy or sell any security. We hold no investment licenses and are thus neither licensed nor qualified to provide investment advice. The content in this report or email is not provided to any individual with a view toward their individual circumstances. InvestorSoup.com is wholly owned by Action Media Holdings Corp. Action Media Holdings Corp has been compensated Twenty Two Thousand Five Hundred Dollars by Raven Consulting Corp (a non-controlling third party) for UEC advertising and promotional services. This compensation constitutes a conflict of interest as to our ability to remain objective in our communication regarding the profiled company. Because of this conflict, individuals are strongly encouraged to not use this newsletter as the basis for any investment decision.

While all information is believed to be reliable, it is not guaranteed by us to be accurate. Individuals should assume that all information contained in our newsletter is not trustworthy unless verified by their own independent research. Also, because events and circumstances frequently do not occur as expected, there will likely be differences between the any predictions and actual results. Always consult a real licensed investment professional before making any investment decision. Be extremely careful, investing in securities carries a high degree of risk; you may likely lose some or all of the investment.